# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 06-1468


OLLIE NEWSOM, ET AL.

VERSUS

LAKE CHARLES MEMORIAL HOSPITAL


************

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO.  2003-547
HONORABLE RICK BRYANT, DISTRICT JUDGE

************

JAMES T. GENOVESE
JUDGE

************

Court composed of Sylvia R. Cooks, Billy H. Ezell, and James T. Genovese, Judges.


**REVERSED AND RENDERED.**

John L. Hammons
Nelson & Hammons, A.P.L.C.
705 Milam Street, Suite A
Shreveport, Louisiana 71101
(318) 227-2401
COUNSEL FOR PLAINTIFFS/APPELLANTS:
 Ollie Newsom, Wanda Newsom Richard, Darrell Williams,
 Pierce Newsom, Reba Martell, and Debbie Johnson

Benjamin J. Guilbeau, Jr.
Stockwell, Sievert, Viccellio, Clements & Shaddock, L.L.P.
Post Office Box 2900
Lake Charles, Louisiana 70602
(337) 436-9491
COUNSEL FOR DEFENDANT/APPELLEE:
 Lake Charles Memorial Hospital

**GENOVESE, Judge.**

In this medical malpractice case, Plaintiffs appeal a jury verdict finding that they failed to meet their burden of proving the applicable standard of care. For the following reasons, we find that a reasonable factual basis does not exist to support the jury verdict and that the record establishes that the jury verdict is clearly wrong and manifestly erroneous. Accordingly, we reverse the jury verdict and render judgment.

## FACTS

On March 18, 1999, Henslin Newsom (Mr. Newsom) was admitted to Lake Charles Memorial Hospital (Lake Charles Memorial). He underwent a coronary angiography which revealed coronary arteriosclerosis. On March 19, 1999, in preparation for the required triple bypass surgery, an intra-aortic augmentation balloon was inserted through Mr. Newsom's femoral artery. Mr. Newsom was then transferred to the hospital's intensive care unit (ICU). On March 20, 1999, he underwent coronary artery bypass surgery and was transferred, post-operatively, back to the ICU where he was to receive one-to-one nursing care from, among others, Samantha Harper (Harper)[1], a registered nurse.

On March 21, 1999, while in the ICU, Mr. Newsom's cardiologist, Dr. Edward F. Crocker, ordered that the intra-aortic balloon pump (the pump) that had been inserted in Mr. Newsom's femoral artery be removed due to its malfunction. Scott Turner, a radiological technician, removed the pump in accordance with the doctor's orders. Approximately two hours after the pump was removed, Mr. Newsom began to hemorrhage from said femoral artery. A code blue was called. Mr. Newsom was then resuscitated and placed on a ventilator. Mr. Newsom remained in a comatose

_____

[1] At the time of trial, Samantha Harper went by Samantha Darbonne. For consistency, we will refer to this individual as Samantha Harper throughout this opinion.

1

condition for ten days until his demise on March 31, 1999.

Mr. Newsom was survived by his spouse of over thirty-five years, Ollie Newsom, and several major children, five of which were listed on the jury verdict form, namely, Wanda Newsom Richard, Darrell Williams, Pierce Newsom, Reba Martell, and Debbie Johnson. Mr. Newsom's surviving spouse and listed major children, Plaintiffs herein, initiated this medical malpractice claim against Defendant, Lake Charles Memorial, by filing a request for a medical review panel on March 16, 2000. The medical review panel rendered its opinion, finding that Lake Charles Memorial did not breach the applicable standard of care. Plaintiffs subsequently filed suit in Calcasieu Parish District Court, and the matter proceeded to trial by jury from June 19 through 22, 2006. The jury returned a verdict in favor of Lake Charles Memorial, finding that Plaintiffs did not prove the applicable standard of care. Judgment in accordance with the jury verdict was signed by the trial court on July 27, 2006. It is from this judgment that Plaintiffs appeal.

## ISSUE

The sole issue raised by Plaintiffs for our review is whether the jury was manifestly erroneous in finding that Plaintiffs did not prove the applicable standard of care owed to Mr. Newsom by Lake Charles Memorial Hospital.

## LAW AND DISCUSSION

**Standard of Review**

> An appellate court may not set aside a jury's finding of fact absent manifest error or unless it is clearly wrong. *Sistler v. Liberty Mut. Ins. Co.*, 558 So.2d 1106 (La.1990). In order to reverse a fact finder's determination of fact, an appellate court must review the record in its entirety and meet the following two-part test: (1) find that a reasonable factual basis does not exist for the finding; and (2) further determine that the record establishes that the fact finder is clearly wrong or manifestly erroneous. *Stobart v. State, Through Dep't of Transp. & Dev.*, 617

2

So.2d 880 (La.1993).

*Greer v. State, Through Dep't Transp. and Dev.*, 06-417, pp. 2-3 (La.App. 3 Cir. 10/4/06), 941 So.2d 141, 145.

**Burden of Proof**

In a medical malpractice action, La.R.S. 9:2794(A) provides that the plaintiff shall have the burden of proving:

> (1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians, dentists, or chiropractic physicians licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; and where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians, dentists, or chiropractic physicians within the involved medical specialty.

> (2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill.

> (3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.

"Thus, according to La.R.S. 9:2794(A), any medical malpractice claimant must establish, by a preponderance of the evidence: (1) the defendant's standard of care; (2) the defendant's breach of that standard of care; and (3) a causal connection between the breach and the claimant's injuries." *Browning v. West Calcasieu Cameron Hosp.*, 03-332, p. 10 (La.App. 3 Cir. 11/12/03), 865 So.2d 795, 804, *writ denied,* 03-3354 (La. 12/13/04), 867 So.2d 691 (citing *Pfiffner v. Correa*, 94-924, 94-963, 94-992 (La. 10/17/94), 643 So.2d 1128).

We have thoroughly examined the record in these proceedings in light of the foregoing legal principles. We find from the record that a reasonable factual basis

3

does not exist to support the jury's finding that Plaintiffs failed to prove the standard of care owed by Lake Charles Memorial to Mr. Newsom. We further find that said jury verdict is clearly wrong, manifestly erroneous, and must be reversed.

**Applicable Standard of Care**

In the case at bar, the jury was presented with special verdict interrogatories. The first interrogatory on the verdict form asked if the jury found by a preponderance of the evidence that Plaintiffs proved the applicable standard of care owed by Lake Charles Memorial to Mr. Newsom. The jury's response was "No."

Plaintiffs assert in brief that they presented ample testimony from three expert witnesses that established the applicable standard of care. Additionally, we note that a plaintiff can establish the applicable standard of care through defense expert testimony and evidence as well. *Pfiffner*, 643 So.2d 1228. In this case, we find that the record contains sufficient independent and aggregate expert testimony establishing the standard of care owed by Lake Charles Memorial to Mr. Newsom.

The first expert testimony presented by Plaintiffs at trial was that of Beatrice Launius (Launius), a nurse practitioner, who was accepted as an expert in nursing.[2] Launius testified that the applicable standard of care required that a partial

_____

[2]This expert witness was called by Plaintiffs to testify as to the applicable standard of care owed by Lake Charles Memorial to Mr. Newsom. It was her testimony that she disagreed with the medical review panel's finding that there was no substandard nursing care in this case. However, noteworthy is Launius' testimony that, in her opinion, physicians are not competent to comment on the standard of nursing care because they are not nurses. This opinion, of course, is legally incorrect. Louisiana Revised Statutes 40:1299.47(C) provides that "[t]he medical review panel shall consist of three health care providers who hold unlimited licenses to practice their profession in Louisiana and one attorney." Additionally, subject to the limitations set forth in La.R.S. 40:1299.47(C)(j), La. R.S. 40:1299.47(C)(3)(f) states that "[a] physician who holds an unrestricted license to practice medicine by the Louisiana State Board of Medical Examiners and who is engaged in the active practice of medicine in this state, whether in the teaching profession or otherwise, shall be available for selection as a member of a medical review panel. Under the provisions of medical malpractice act, "[t]he panel shall have the sole duty to express its expert opinion as to whether or not the evidence supports the conclusion that the defendant or defendants acted or failed to act within the appropriate standards of care." Thus, Launius's opinion that physicians are not competent to testify on the standard of care required of nurses is legally incorrect.

thromboplastin test (PTT)[3] be performed before the pump was removed. Launius also testified that nursing standards require that the nurse chart the nature and time that pressure is applied to the patient's femoral artery after the pump is removed. Another standard set forth by Launius was an obligation of the attending nurse to closely observe the patient, especially one such as Mr. Newsom, who was confused or disoriented. Launius provided her expert opinion regarding the standard of care required of a nurse in responding to a sixty-point drop in blood pressure. Launius opined that a nurse should conduct a physical exam of the patient, obtain lab work, place a call to his physician, and consider hemorrhage at the pump insertion sight in her assessment. Finally, Launius was questioned as to the standard of care which was most discussed at the trial; namely, the practical application of the term one-to-one nursing care. According to Launius, if a nurse has been assigned to care for a patient on a one-to-one basis, that nurse is not allowed to leave the patient's bedside at any time without asking a colleague to take over the patient's care in her absence. It was the opinion of Launius that the foregoing standards were required to have been met by Lake Charles Memorial, through its employees, while caring for Mr. Newsom.

The second expert witness to testify on behalf of Plaintiffs as to the applicable standard of care was Dr. David Elizardi (Dr. Elizardi), a cardiologist. Dr. Elizardi testified as to the manner in which the pump was to be removed. It was his opinion that the technician was required to apply the correct method and type of pressure for the proper period of time to allow for appropriate clotting. Additionally, in his opinion, the standard of care required the nurse to chart the nature and duration of the pressure which was applied. According to Dr. Elizardi, when Mr. Newsom

_____

[3]A partial thromboplastin test (PTT) and an activated clotting time test (ACT) are two coagulation tests which are used to determine a patient's clotting time.

5

experienced a sixty-point drop in his blood pressure, applicable standards required the nurse to contact the patient's doctor to notify him of the patient's condition. Finally, Dr. Elizardi testified that the meaning of the one-to-one designation of Mr. Newsom meant that the nurse assigned to him should have been with him and observing him at all times in order to be compliant with that designation.

Patsy McHan (McHan), who was accepted as an expert in the field of registered nursing specializing in ICU care, and a medical legal consultant, also testified on behalf of Plaintiffs on the issue of standard of care. In McHan's opinion, the decrease in Mr. Newsom's blood pressure required that the nurse not leave his side; and further, she was to call out for help and instruct someone to contact the patient's doctor. She also testified that applicable nursing standards require complete and accurate charting by the nurse attending to that patient. This expert also testified that since Mr. Newsom was given a one-to-one designation, the standard of care for a nurse required that he be "constantly observed." Under such circumstances, according to McHan, if the nurse leaves the patient's presence, she must make arrangements for someone else to monitor her patient one-to-one.

Lake Charles Memorial, through the testimony of its expert witnesses, also put forth evidence before the jury on the applicable standard of care which it owed Mr. Newsom. Denise Collette (Collette), a registered nurse certified in critical care, testified as to the performance of PTT. It was her testimony that the American Association of Critical-Care Nurses (AACN) Procedural Manual for Critical Care does not require that any coagulation test be done before a pump is removed. She also testified that the manual does provide that pressure be applied to the femoral artery after the removal of a pump for thirty to forty-five minutes. On the issue of

6

appropriate charting by a nurse, Collette testified that a nurse is required to chart significant findings and that said charting may be done collectively. Finally, Collette opined that the phrase one-to-one nursing care is a term used to describe a manner of observing a patient where a nurse is not given more than one patient to care for. When asked for a reference defining the phrase one-to-one nursing care, Collette testified that there was none; further, the AACN's manual for critical care does not instruct a nurse to never leave the bedside of a patient with a one-to-one designation.

Another expert witness called by Lake Charles Memorial was Sherry Haley (Haley), a registered nurse with a master's degree in nursing.[4] Haley testified that generally "[t]he standard of care expected of nurses . . . is to do the best to their ability, knowledge and skills." When asked her expert opinion on the appropriate response to a decrease in a patient's blood pressure, she testified that it is one thing to be considered in assessing the patient, but that considering all other findings relative to Mr. Newsom's condition at that time, she would not "be concerned about that blood pressure enough to call the physician." Haley also opined that a nurse cannot physically chart everything that she does on a patient and that it is permissible for a nurse to chart significant findings collectively. Specifically regarding one-to-one nursing care, Haley stated that the phrase means that one nurse is assigned to one patient. She disagreed with the proposition that a one-to-one designation meant that the nurse could never leave the patient's bedside and opined that such would be an impossibility.

Although Lake Charles Memorial contends that Plaintiffs "failed to provide any documentary evidence of standard of care policies and procedures or any other

---

[4]Haley was also a member of the Louisiana State Board of Nursing for five years and served as the president of the board for two terms.

source other than their expert's own oral testimony to establish what they felt [the] standard of care should be[,]" it also asserts in brief that "[t]he hospital established through recognized nursing guidelines, its own policy and procedure and multiple witnesses of what the appropriate standard of care was at Lake Charles Memorial Hospital." Thus, while Lake Charles Memorial argues that Plaintiffs failed to meet their burden of proving the standard of care, it also contends that the standard of care was proven by them. No less than four nurses and one physician, each of which were qualified as experts in their respective fields, testified as to a nurse's standard of care under the facts and circumstances of this case. For the detailed reasons set forth above, we find that ample evidence was presented to the jury on the standard of care owed to Mr. Newsom by Lake Charles Memorial. Having reviewed the record in its entirety, we find that a reasonable factual basis does not exist to support the jury verdict; therefore, the jury was clearly wrong and manifestly erroneous in its determination that Plaintiffs failed to prove the standard of care. We, therefore, reverse the jury verdict.

Since we have determined that the jury erroneously found that the applicable standard of care was not proven, and the remaining issues in this case having not been addressed, we must now undertake a *de novo* review of these remaining issues, i.e., a breach, *vel non*, of the applicable standard of care and, if so, causation and damages. *Robicheaux v. Adly*, 02-37 (La.App. 3 Cir. 6/12/02), 827 So.2d 441, *writ denied*, 02-2783 (La. 2/7/03), 836 So.2d 100; *Williams v. Dauterive Hosp.*, 99-1935 (La.App. 3 Cir. 10/11/200), 771 So.2d 763, *writ denied*, 00-3107 (La.1/5/01), 778 So.2d 1144.

Plaintiffs also argue in brief that "[t]he members of the jury were apparently confused by the first question on the Jury Verdict Form" as evidenced by the written

question they presented to the trial judge jury during deliberations. Having determined that the jury was manifestly erroneous in finding that Plaintiffs failed to establish the appropriate standard of care, the issue of jury confusion has been rendered moot.

**Breach of the Standard of Care**

An examination of the issue of whether Lake Charles Memorial breached the standard of care owed to Mr. Newsom requires additional discussion of the patient's condition and the medical treatment administered to him. As set forth at the outset of this opinion, Mr. Newsom was admitted to Lake Charles Memorial on March 18, 1999, and underwent a coronary angiography, which revealed coronary arteriosclerosis. To assist Mr. Newsom's heart function prior to his surgery, an intra-aortic augmentation balloon pump[5] was inserted on March 19, 1999, and Mr. Newsom was kept in the ICU. The following day, he underwent coronary artery triple bypass surgery. Post-operatively, he was returned to the ICU where he was considered to be a high risk patient and designated to receive one-to-one nursing care. The pump which had been inserted into Mr. Newsom's femoral artery remained in place while he was in the ICU. He was to be assessed every ten to fifteen minutes for the first two and one half hours, and every thirty minutes thereafter.

On March 21, 1999, at 1:00 a.m., Harper, an ICU nurse assigned to Mr. Newsom for one-to-one care, noted that the balloon pump was malfunctioning. A

---

[5]The record contains considerable medical testimony on the manner in which such a pump is to be inserted into the femoral artery. Undisputedly, such a procedure requires that a significant hole be made in the artery for the insertion of an introducer tube into which a catheter is placed so that the balloon may be inserted. The procedure requires that a hole approximately the size of the circumference of a pencil be made in the artery. Additionally, when the pump is removed from a patient, a sizable hole remains, creating a known complication of hemorrhage (heavy bleeding) from the site. Therefore, following the removal of the pump, direct pressure is applied to the site until hemostasis (clotting) occurs.

9

radiological technician, Scott Turner, was called. After discussion with Mr. Newsom's cardiologist, Dr. Crocker, and in accordance with the doctor's instruction, at approximately 2:00 a.m., Turner testified that he removed the pump in the presence of Harper. At 2:30 a.m., Mr. Newsom was anxious, moving about in the bed, told to keep his right leg straight, and given morphine sulphate for his complaints of pain. At 3:00 a.m., his vital signs were stable, his blood pressure was 169/69, and he was "resting quietly" with no acute distress noted. At 3:30 a.m., he was again described as "anxious" and was "moving about in bed." Additionally, at 3:30 a.m., Mr. Newsom experienced a sixty-point decrease or drop in his blood pressure down to 110/88. In response, Harper reassessed Mr. Newsom by looking at the puncture site in the femoral artery, noting that the dressing was dry and intact, checking his heart rate, and taking his pedal pulse.[6] According to Harper, these findings reassured her that the decrease in Mr. Newsom's blood pressure was not the result of bleeding. Well aware of the medical history of Mr. Newsom, the seriousness of his condition, and the one-to-one designation of his care to her, Harper then left the room to get linens and supplies in order to re-stock the room and eventually give Mr. Newsom a bath. Approximately eighteen minutes later, *while at the nurses station*, Harper heard the alarm of a monitor and returned to Mr. Newsom's room to check on him. She began what is referred to as a head-to-toe assessment. When she pulled the blankets back from Mr. Newsom, she saw blood. She recognized that the patient was bleeding from his femoral artery where the pump had been removed. She responded by applying pressure to the site and yelled for help. A code blue was called. Mr. Newsom was resuscitated and, due to his condition, placed on a ventilator. He never

_____

[6]The pedal pulse rate is taken at the top of a person's foot, and on the inside of the ankle, to ensure blood flow to the extremity.

10

regained consciousness and died on March 31, 1999.

Plaintiffs assert that Lake Charles Memorial, through its employee nurse and radiological technician, breached the standard of care which it owed to Mr. Newsom in the actions or inactions taken at more than one interval during the course of his care and treatment. We have reviewed each of these assertions and, considering the totality of the circumstances, find merit in Plaintiffs' contention that Lake Charles Memorial, through its employee nurse, breached the applicable standard of care in its care and treatment of Mr. Newsom. According to the doctrine of respondeat superior, Lake Charles Memorial is vicariously liable and answerable to Plaintiffs for the negligence of its employees in the course and scope of their employment. La.Civ.Code art. 2320.[7]

McHan testified that at 3:00 a.m. Mr. Newsom's blood pressure was at 169/69 at that he was described as resting peacefully. However, thirty minutes later, his condition was quite different. Mr. Newsom's blood pressure had decreased to 110/88, and he had become anxious and was moving about in the bed. McHan testified that since Mr. Newsom was a cardiac bypass patient, who had a pump

_____

[7] Louisiana Civil Code Article 2320 provides as follows:

    Art. 2320. Acts of servants, students or apprentices

    Masters and employers are answerable for the damage occasioned by their servants and overseers, in the exercise of the functions in which they are employed.

    Teachers and artisans are answerable for the damage caused by their scholars or apprentices, while under their superintendence.

    In the above cases, responsibility only attaches, when the masters or employers, teachers and artisans, might have prevented the act which caused the damage, and have not done it.

    The master is answerable for the offenses and quasi-offenses committed by his servants, according to the rules which are explained under the title: Of quasi-contracts, and of offenses and quasi-offenses.

11

removed approximately one hour earlier, a sixty-point drop in Mr. Newsom's blood pressure was "very significant." She explained that even with sedation, Mr. Newsom had not had such a drop in blood pressure and that a decrease in blood pressure "from 169 to 110 [was] a drastic change" which would have alarmed her very much. McHan testified that in response to such a decrease in a patient's blood pressure, she would not have left the bedside, but would have had somebody in the unit contact the patient's doctor. In McHan's opinion, the medical condition of Mr. Newsom at 3:30 a.m. was a life-threatening emergency; yet, despite Harper's inability to explain the change in his condition, she took no affirmative steps to help the patient, and she did not contact his physician. Thus, McHan testified that Harper's actions were below the applicable nursing standards.

Dr. Elizardi agreed with McHan that from 3:00 a.m., when Mr. Newsom was resting quietly, until 3:30 a.m., the condition of Mr. Newsom was very different. Specifically, in his opinion, "[a] [sixty]-point drop in any patient over [thirty] minutes is significant at any time," and particularly for Mr. Newsom who had had the pump recently removed. Dr. Elizardi explained that because the pump had recently been removed, that Mr. Newsom was anxious and that his blood pressure had dropped significantly, which indicated that "something was not right." He would have expected that the patient's physician be contacted. In Dr. Elizardi's opinion, the patient needed *further assessment and evaluation*. According to Dr. Elizardi, it was below the applicable standard of care for Harper not to have contacted the Mr. Newsom's doctor to advise him of the significant changes in his patient's status, particularly since she had not made a determination of the cause of a sixty-point drop in blood pressure.

12

Launius also testified that in her opinion Harper breached the applicable nursing standard of care by failing to appropriately respond to the decrease in Mr. Newsom's blood pressure. Noting that 148/69 was the lowest the patient's pressure had been, Launius described this decrease in his blood pressure as a "big drop" which she opined was "significant" enough to cause concern that the patient was either bleeding or was having a problem with his heart function. In order to determine whether he was bleeding externally or internally, Launius testified that the dressing site should have been observed and an examination made of the thigh to detect any change in the tissues, as well as observing underneath the patient to insure that he was not bleeding and that blood was not collecting underneath him. Launius also testified that she would have considered calling the patient's physician and running some lab work to determine if bleeding was occurring. In short, Launius was of the opinion that Mr. Newsom's medical condition "required further intervention and investigation." Launius testified that in Harper's care of Mr. Newsom, she failed to provide him with adequate attention, and her failure to take any of these measures was a breach of the applicable nursing standards.

Undisputedly, Dr. Crocker was not contacted at 3:30 a.m. when Mr. Newsom's blood pressure dropped from 169/69 to 110/88. Harper testified that she was aware of the drop in blood pressure and that she reassured herself with multiple indicators that the drop in pressure was not indicative of a significant event. Specifically, she determined that Mr. Newsom's heart rate was not elevated, that his dressing was dry and intact, and that his pedal pulses were good. Therefore, she testified that the isolated decrease in blood pressure, when considered with her overall assessment, did not require that the physician be called. We disagree.

13

As Harper explained in detail, post-operatively, Mr. Newsom was at risk for multiple complications including stroke, pulmonary embolus, respiratory problems, cardiac arrest, and kidney problems, all in addition to a potential hemorrhage from the groin or surgical site. For all of these reasons, Mr. Newsom was considered a high risk patient assigned one-to-one nursing care to be administered by Harper.

In determining whether or not there was a breach of the standard of care in this case, we do not look at one isolated action or inaction, but at the *totality of the circumstances*. Harper was well aware of the fact that Mr. Newsom had just undergone triple bypass heart surgery on March 20, 1999, the effects of said surgery, and the potential complications therefrom. She was aware that Mr. Newsom, even though restrained, had previously extubated[8] himself and that he was confused or disoriented. She was also aware that the pump inserted in Mr. Newsom's femoral artery had malfunctioned around 1:00 a.m. on March 21, 1999, and that it had been removed by the technician pursuant to the doctor's orders an hour later, around 2:00 a.m. Harper was likewise aware of the fact that the removal of the pump left a hole approximately the size of the circumference of a pencil in Mr. Newsom's femoral artery, which had to be sealed off and closely monitored to avoid any hemorrhage.

The medical chart notes in the record clearly indicate that at 2:30 a.m., Mr. Newsom was moving about in bed, complaining of pain, instructed to keep his right leg straight, and given morphine sulphate. Harper checked Mr. Newsom at 3:00 a.m. and noted that his vital signs were stable and that he was "resting quietly." However, at 3:30 a.m., a significant change occurred. Harper noted that Mr. Newsom was again "moving about in bed[,]" anxious, and that his blood pressure had dropped nearly

---

[8]Extubation is the removal of a tube from a hollow organ or body passage.

14

sixty points. She stated that she reassessed him, tried to determine the cause of the significant drop in blood pressure, and found no bleeding. At this time, Harper opted not to contact the doctor in charge and simply left the room to get "supplies" and "linens" to restock the room and bathe the patient.

Approximately eighteen minutes later, while at the nurses' station, all the while Mr. Newsom being left alone and unattended in his room, Mr. Newsom's alarm sounded. Harper rushed to Mr. Newsom's room, assessed her patient, and found him hemorrhaging and in a "pool of blood." Mr. Newsom had lost four units (half of a gallon) of blood. Harper immediately attended to Mr. Newsom, signaled a code blue, and yelled for assistance. Mr. Newsom lost consciousness, never regained it, and died ten days later on March 31, 1999.

Having thoroughly reviewed the medical and legal record in this case, we find from a totality of the circumstances that the post-operative nursing treatment administered to Mr. Newsom breached the standard of care owed to Mr. Newsom by Lake Charles Memorial. Not any one action or inaction of Harper constituted a breach of the standard of care, but all factors considered in the manner in which Mr. Newsom was treated, post-operatively, did breach the standard of care. The mere fact alone that Harper chose not to call the doctor at 3:30 a.m. when Mr. Newsom's blood pressure dropped sixty points did not in and of itself constitute a breach of the standard of care. The mere fact alone that Harper was not constantly at Mr. Newsom's side in her one-to-one care did not breach the standard of care.

However, knowing that Mr. Newsom had just undergone triple bypass heart surgery, that he was confused/disoriented to the point of extubation, that he was restless, that he had just had a pump removed from his femoral artery leaving a hole

15

the size of the circumference of a pencil, that he was subject to hemorrhage, that he was anxious (despite having been given morphine), that a hemorrhage or embolism could result in a serious/life threatening situation, that he had encountered a sixty-point drop in blood pressure, that despite her assessment she was unable to determine the cause of that sixty-point drop in his blood pressure, and despite the designation of one-to-one care of him to her, Harper chose not to call the doctor, and simply left Mr. Newsom, unobserved and unattended, for eighteen minutes while she sought supplies and linens to restock Mr. Newsom's room. In fact, Harper was at the nurses' station when Mr. Newsom's alarm sounded, some *eighteen minutes* after she had left him alone. It is unclear from the record as to why Harper was at the nurses' station at this critical time and just how long she would have remained at the nurses' station had the alarm in Mr. Newsom's room not sounded. Harper never asked for help from any other hospital personnel in gathering linens and supplies. She never asked for any assistance until the code blue was called. Ironically, she did testify, however, that she would get another nurse to sit for her if she needed to go to the restroom, that she called the doctor when Mr. Newsom extubated himself, and that the doctor was called when the pump malfunctioned, but the doctor was not called when Mr. Newsom's blood pressure inexplicably dropped sixty points and, after her assessment, she was unable to determine the cause therefor. In lieu thereof, Harper took it upon herself to leave Mr. Newsom, unobserved and unattended, to go off in search of linens and supplies, and be inexplicably at the nurses' station some eighteen minutes later, when Mr. Newsom's alarm sounds. Harper's actions and/or inactions in her care of Mr. Newsom from 3:30 a.m. until the alarm sounded certainly do not satisfy her designated obligation of providing one-to-one care to Mr. Newsom.

16

Considering the totality of these factors and events, we find that Lake Charles Memorial breached the standard of care due and owing its patient, Mr. Newsom.

**Causation**

In order to prevail in a medical malpractice claim, Plaintiffs also have the burden of proving "[t]hat as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred." La.R.S. 9:2794(A)(3). In the instant matter, Plaintiffs assert that but for the negligence of Lake Charles Memorial, through its employee nurse, Mr. Newsom's injuries and death would not have occurred. They contend that "[t]he hemorrhage was a substantial contributing factor in his brain damage and ultimately his death." We agree.

On the issue of causation, Plaintiffs presented the expert testimony of Dr. Elizardi and Dr. George M. McCormick (Dr. McCormick)[9]. In medical terminology, according to Dr. McCormick, the cause of Mr. Newsom's death was "anoxic encephalopathy secondary to external blood loss." Dr. McCormick explained that the bleed is what led to Mr. Newsom's ultimate death, and the underlying cause was his cardiac condition. Dr. Elizardi agreed. It was his testimony that the hemorrhage was a substantial contributing factor in Mr. Newsom's brain damage and ultimately his death. In Dr. Elizardi's opinion, Mr. Newsom lost enough blood to result in cardiac failure and brain damage.

Based on the foregoing, we find that as a result of the fault of Lake Charles Memorial, through its employee nurse, Mr. Newsom suffered injuries and death that would not have otherwise occurred. Therefore, we find that Plaintiffs have met their

---

[9]Dr. McCormick is the duly elected coroner in Caddo Parish, and a special deputy coroner in Bossier Parish, who was called to testify as to the cause of Mr. Newsom's death.

burden of proving the proximate causal connection between the breach of the standard of care and Mr. Newsom's injuries and ultimate death as required under La.R.S. 9:2794(A)(3).

**Damages**

Louisiana Revised Statutes 40:1299.42 provides that "[t]he total amount recoverable for all malpractice claims for injuries to or death of a patient, exclusive of future medical care and related benefits as provided in R.S. 40:1299.43, shall not exceed five hundred thousand dollars plus interest and cost." Additionally, "[t]he malpractice cap is administered per patient, rather than per plaintiff." *Hall v. Brookshire Bros. Ltd.*, 01-1506, p. 29 (La.App. 3 Cir. 8/21/02), 831 So.2d 1010, 1029, *dec. aff'd*, 02-2404 (La.6/27/03), 848 So.2d 559 (citing *Hollingsworth v. Bowers*, 96-257 (La.App. 3 Cir. 12/30/96), 690 So.2d 825).

The present medical malpractice claim includes a survival action on behalf of Mr. Newsom and wrongful death claims of his spouse and five of his major children. However, in awarding damages, we are mindful that the total amount recoverable in the instant case for the injuries and death to Mr. Newsom is $500,000.00. We also acknowledge the stipulation of the parties to medical bills in the amount of $10,000.00, and funeral and burial expenses of $4,988.71.

We find from a review of the record, particularly supported by the testimony of the surviving spouse and five major children as to the close and loving relationship each had with Mr. Newsom, that the damages sustained as a result of the injury and death to Mr. Newsom exceed the $500,000.00 statutory cap on damages. Had there been no statutory cap on damages, we would have awarded wrongful death damages to Ollie Newsom, the surviving spouse of Mr. Newsom for over thirty-five years, the

18

sum of $250,000.00 (which includes the stipulated medical expenses of $10,000.00, and the stipulated funeral and burial expenses of $4,988.71). For the five listed major children, we would have awarded wrongful death damages of $100,000.00 to each. However, considering the $500,000.00 statutory cap, the legally restricted award must be apportioned as follows:

a. Ollie Newsom, surviving spouse. . . . . . . . . . . . . . . . . $ 166,666.67
   (which includes the stipulated
   medical and funeral expenses)
b. Wanda Newsom Richard . . . . . . . . . . . . . . . . . . . . . . . . .66,666.66
c. Darrell Williams . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66,666.66
d. Pearce Newsom . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66,666.67
e. Reba Martell . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66,666.67
f. Debbie Johnson . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66,666.67

We further find that Plaintiffs have failed to prove by a preponderance of the evidence any survival action; therefore, no damages were awarded therefor. Furthermore, any damage claim in addition to Plaintiffs' wrongful death claims would be rendered moot, considering our finding that the wrongful death claims alone exceed the statutory cap.

## DECREE

For the foregoing reasons, we reverse the jury's verdict finding that Plaintiffs did not prove the applicable standard of care owed by Lake Charles Memorial Hospital to Mr. Newsom. We further find that Lake Charles Memorial Hospital breached the standard of care owed to Mr. Newsom and that said breach was the proximate cause of Mr. Newsom's injuries and ultimate death. Therefore, we render judgment herein in favor of Ollie Newsom, Wanda Newsom Richard, Darrell Williams, Pierce Newsom, Reba Martell, and Debbie Johnson, and against Lake Charles Memorial Hospital as follows:

For the foregoing reasons, IT IS ORDERED, ADJUDGED, AND DECREED

19

that the judgment of the trial court pursuant to jury verdict is reversed and set aside and that there be judgment herein in favor of Ollie Newsom and against Lake Charles Memorial Hospital in the amount of ONE HUNDRED SIXTY-SIX THOUSAND SIX HUNDRED SIXTY-SIX AND 67/100 ($166,666.67) DOLLARS, together with legal interest from the date of the filing of the complaint (March 16, 2000) until paid as per La.R.S. 40:1299.47(M),[10] and for all costs of trial and these appellate proceedings.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that there be judgment in favor of Pierce Newsom, Reba Martell, and Debbie Johnson and against Lake Charles Memorial Hospital in the amount of SIXTY-SIX THOUSAND SIX HUNDRED SIXTY-SIX AND 67/100 ($66,666.67) DOLLARS, each, together with legal interest from the date of the filing of the complaint (March 16, 2000) until paid as per La.R.S. 40:1299.47(M), and for all costs of trial and these appellate proceedings.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that there be judgment in favor of Wanda Newsom Richard and Darrell Williams and against Lake Charles Memorial Hospital in the amount of SIXTY-SIX THOUSAND SIX HUNDRED SIXTY-SIX AND 66/100 ($66,666.66) DOLLARS, each, together with legal interest from the date of the filing of the complaint (March 16, 2000) until paid as per La.R.S. 40:1299.47(M), and for all costs of trial and these appellate proceedings.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that the liability

---

[10]Louisiana Revised Statutes 40:1299.47(M) provides that "[l]egal interest shall accrue from the date of filing of the complaint with the board on a judgment rendered by a court in a suit for medical malpractice brought after compliance with this Part."

of Lake Charles Memorial Hospital is subject to the provisions of La.R.S. 40:1299.42.

**REVERSED AND RENDERED.**