McCLENDON, J.
Un this medical malpractice case, the plaintiff, Angele D. Marroy, individually and as the administrator of the estate of her minor child, Collin Andrew Marroy, appeals from the judgments of the trial court following a jury verdict that rejected her claim against the defendant, Peter H. *309 Hertzak, M.D., and denied her motion for judgment notwithstanding the verdict (JNOV) or alternatively for a new trial.[1] For the reasons that follow, we affirm.
FACTS AND PROCEDURAL HISTORY
This case arises from the obstetric care provided by Dr. Hertzak to Ms. Marroy during her pregnancy, which resulted in the birth of her second child, Collin Andrew Marroy, at Northshore Regional Medical Center in Slidell. Ms. Marroy asserts that Dr. Hertzak negligently induced delivery of her premature baby on the evening of June 25, 2000, resulting in respiratory and other complications, requiring Collin’s hospitalization for several weeks in the pediatric intensive care unit. She further contends that Collin continued to require care and treatment thereafter.
Ms. Marroy became a patient of Dr. Hertzak in 1993. In 1995, he delivered a full-term healthy baby girl to Ms. Marroy. On November 22, 1999, Ms. Marroy, again pregnant, presented to Dr. Hertzak and reported her last menstrual period to be on October 15, 1999. Based on this information, an estimated due date of July 23, 2000, was calculated. At an office visit on March 20, 2000, Dr. Hertzak performed a routine ultrasound. The ultrasound established an estimated due date of July 21, 2000.
Ms. Marroy’s pregnancy progressed without any problems until May 18, 2000, when Ms. Marroy reported decreased fetal activity to Dr. Hertzak. Dr. Hertzak ordered an ultrasound and biophysical profile, which were performed at the hospital. The ultrasound indicated no fetal distress at the time it was taken, and based on the ultrasound, the radiologist estimated a due date of June 27, |s2000. At an office visit on June 6, 2000, Ms. Marroy again reported decreased fetal activity. Dr. Hertzak ordered another ultrasound, which was again taken at the hospital and reported as normal, with an estimated due date of June 26, 2000. Dr. Hertzak also placed an order for June 9, 2000, for non-stress testing to monitor the fetus’s heart tones. On that date, the nurse reported two incidences of variable decelerations. On June 18, 2000, Ms. Marroy reported another episode of decreased fetal movement, and that evening, Dr. Hertzak decided to try to induce labor. That induction was unsuccessful and was ultimately terminated. He scheduled another induction for the evening of June 25, 2000, which resulted in Collin’s birth on June 26, 2000. Collin developed severe respiratory distress and was taken to the neonatal unit, where he remained for a month.
Ms. Marroy’s claims were presented to a medical review panel. On June 19, 2003, the panel rendered a unanimous adverse opinion finding that Dr. Hertzak failed to comply with the applicable standard of care as charged in the complaint. Specifically, the panel concluded that it was a deviation from the standard of care to change a fairly well established due date based on a third trimester ultrasound, and that the baby suffered significant damage due to its premature delivery. Thereafter, on August 7, 2003, this lawsuit was filed.
The trial of this matter began on February 22, 2010, and, at the conclusion of a four-day trial, the jury returned a verdict on February 26, 2010, finding that Ms. Marroy had not “established by a preponderance of the evidence the standard of *310 care ordinarily practiced by physicians with the medical specialty of obstetrics and gynecology that pertains to the conduct of the defendant Peter Hertzak, M.D.” The jury additionally found that it was not proven “by a preponderance of the evidence that defendant Peter Hertzak, M.D. breached or violated the applicable standard of care concerning the treatment of Angele Marroy and Cohn Marroy.” In response to the jury verdict, Ms. Marroy filed Plaintiffs Motion for A Judgment Notwithstanding the Verdict, or, in the Alternative, for a New Trial. The trial court denied the motions for JNOV and |4new trial, and Ms. Marroy filed this appeal.[2] In her appeal, she makes the following assignment of errors:
1) The trial court erred in having the jury determine the existence of a legal duty or a medical standard of care.
2) The jury’s verdict that plaintiff had not proven the existence of an applicable standard of care by a preponderance of the evidence was manifestly erroneous.
3) The trial court erred in not granting Plaintiffs Motion for a Judgment Notwithstanding the Verdict, or, in the Alternative, for a new Trial, inasmuch as the jury’s verdict was manifestly erroneous given the evidence introduced at trial.
STANDARD OF REVIEW
An appellate court may not set aside a jury’s finding of fact absent manifest error or unless it is clearly wrong. Sistler v. Liberty Mut. Ins. Co., 558 So.2d 1106, 1111 (La.1990). In order to reverse a fact finder’s determination of fact, an appellate court must review the record in its entirety and meet the following two-part test: (1) find that a reasonable factual basis does not exist for the finding; and (2) further determine that the record establishes that the fact finder is clearly wrong or manifestly erroneous. Stobart v. State, Through Dept. of Transp. & Dev., 617 So.2d 880, 882 (La.1993).
The issue to be resolved by a reviewing court is not whether the trier of fact was right or wrong, but whether the factfin-der’s conclusion was a reasonable one. Where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. Rosell v. ESCO, 549 So.2d 840, 844 (La.1989). Where there are two permissible views of the evidence, the factfin-der’s choice | r,between them cannot be manifestly erroneous or clearly wrong. Id. Further, when findings are based on determinations regarding the credibility of witnesses, the manifest error-clearly wrong standard demands great deference to the trier of fact’s findings; for only the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener’s understanding and belief in what is said. Id.
Nevertheless, when the court of appeal finds that a reversible error of law or manifest error of material fact was made in the trial court, it is required to redetermine the facts de novo from the entire record and render a judgment on the merits. Id., 549 So.2d at 844 n. 2.
DISCUSSION.
In a medical malpractice action, LSA-R.S. 9:2794 A provides that the plaintiff shall have the burden of proving:
*311 (1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians, dentists, optometrists, or chiropractic physicians licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; and where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians, dentists, optometrists, or chiropractic physicians within the involved medical specialty.
(2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill.
(3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.
Thus, according to LSA-R.S. 9:2794 A, any medical malpractice claimant must establish, by a preponderance of the evidence: (1) the defendant’s standard of care; (2) the defendant’s breach of that standard of care; and (3) a causal connection between the breach and the claimant’s injuries. Pfiffner v. Correa, 94-924, 94-963, 94-992 (La.10/17/94), 643 So.2d 1228, 1233.
| Jn her first assignment of error, Ms. Marroy argues that in the first interrogatory the jury was improperly asked to determine the existence of a legal duty, which resulted in legal error that interdicted the factfinding process requiring a de novo review of the record. She also asserts that because the jury found that a standard of care was not proven, but then determined that the standard of care was not breached by Dr. Hertzak in the second interrogatory, the jury’s findings were logically inconsistent.
In this matter, the relevant part of the jury verdict form provided as follows:
1. Do you find that plaintiffs Angele Marroy and Colin Marroy established by a preponderance of the evidence that standard of care ordinarily practiced by physicians with the medical specialty of obstetrics and gynecology that pertains to the conduct of the defendant Peter Hertzak, M.D.?
Yes
/ No
2. Do you find by a preponderance of the evidence that defendant Peter Hertzak, M.D. breached or violated the applicable standard of care concerning his treatment of Angele Marroy and Colin Marroy?
Yes
/ No
If your answer to this question is “No,” then sign and date this form and return it to the bailiff. If your answer to this question is “Yes,” then proceed to question No. 3.
The jury answered both interrogatories in the negative.
Initially, we find that Ms. Marroy cannot be heard on correctness of the jury interrogatories, because she did not object at any time at the trial court level so as to preserve her right to appeal. No objection was made during the court’s jury charge conference or thereafter. Objections were *312 made to several of the jury instructions, but there is nothing in the record to indicate that any objection was made to the jury interrogatories prior to this appeal. As a result, the trial court never had an opportunity to take remedial action while the jury was present or otherwise rule on the question, as provided by LSA-C.C.P. arts. 1812 and 1813. See Johnson v. Terrebonne Parish Sheriffs Office, 95-1180 (La.App. 1 Cir. 2/23/96), 669 So.2d 577, 583, writ denied, 96-0727 (La.4/26/96), 672 So.2d 907. See also Metz v. Howard, 93-726 (La.App. 5 Cir. 1/25/94), 631 So.2d 1248, 1250-51; Bourque v. Gulf Marine Transportation, Inc., 480 So.2d 337, 340 (La.App. 3 Cir.1985).
 However, even were we to address this issue, we cannot say that the jury verdict form constituted reversible error. A verdict form may not be set aside unless the form is so inadequate that the jury is precluded from reaching a verdict based on correct law and facts. Ford v. Beam Radiator, Inc., 96-2787 (La.App. 1 Cir. 2/20/98), 708 So.2d 1158, 1160. Jury interrogatories must fairly and reasonably point out the issues to guide the jury in reaching an appropriate verdict. If the verdict form does not adequately set forth the issues to be decided by the jury (i.e., omits an applicable essential legal principle or is misleading and confusing), such interrogatories may constitute reversible error. Abney v. Smith, 09-0794 (La.App. 1 Cir. 2/8/10), 35 So.3d 279, 283, writ denied, 10-0547 (La.5/7/10), 34 So.3d 864.
There is nothing in the first two jury interrogatories that misstates or misapplies the law. In the case of a particular medical specialty, the medical malpractice act requires that the plaintiff shall have the burden of proving “[t]he degree of care ordinarily practiced by physicians ... within the involved medical specialty.” LSA-R.S. 9:2794 A(l). The first jury interrogatory asked whether Ms. Marroy established by a preponderance of the evidence the applicable standard of care. It did not require the jury to determine the existence of a legal duty as suggested by Ms. Marroy.
Additionally, the trial court in ruling on the motion for a JNOV or new trial, determined that this case was similar to the third circuit case of Ardoin v. McKay, 06-0171 (La.App. 3 Cir. 9/27/06), 939 So.2d 698, writ denied, 06-2606 (La.1/8/07), 948 So.2d 126. We agree. The trial court recognized that in Ardoin the jury interrogatories were similar to those in this matter. Also, like this instant case, the jury answered both interrogatories in the negative. Further, as in the Ardoin case, the jury in this matter, in responding to the interrogatories, could have stopped after answering the first interrogatory in the |Rnegative. A negative answer to the first interrogatory essentially terminated the litigation and eliminated the need to answer the second interrogatory. Also, as in Ardoin, there was no instruction after the first interrogatory to sign and date the form and return it to the bailiff if the answer to the question was “No,” but to proceed if the answer was “Yes.” See Ardoin, 939 So.2d at 702. Nonetheless, by also answering the second interrogatory in the negative, the jury was very clear as to what it believed was established by the evidence. In its ruling, the third circuit stated:
In any event, whatever the jury’s confusion may have been as to the first interrogatory, there can be no doubt it understood the second. This interrogatory asked for the jury’s verdict on the heart of the case-whether Dr. McKay breached the standard of care applicable to his treatment of Mr. Ardoin. The jury’s answer to that question and its compliance with the parenthetical in *313 struction following that interrogatory leave no doubt concerning the jury’s belief on this issue.
Ardoin, 939 So.2d at 703.[3] Likewise, in this matter, despite any confusion as to the first interrogatory,[4] there is no doubt that the jury understood the second jury interrogatory and responded accordingly. This assignment of error is without merit.
However, Ms. Marroy next argues that if the first jury interrogatory was proper, then the jury verdict regarding the interrogatories was manifestly erroneous. Ms. Marroy asserts that the evidence clearly established the applicable standard of care, as well as a breach of that standard. In support of her position, she presented the testimony of several expert witnesses.[5]
Dr. Martha J. Brewer, an expert in the field of obstetrics and gynecology, testified by video deposition, taken on February 8, 2010, on behalf of Ms. Marroy. Dr. Brewer, who was a member of the medical review panel, testified that there is an accepted national standard of care. She testified that in the |npractice of obstetrics, one of the most important things to be done in terms of prenatal care is to establish an accurate gestational age. She stated that as a general rule, the earlier the ultrasound is taken the better it is to determine an accurate age. Dr. Brewer testified that it looked like Dr. Hertzak changed the due date after the later ultrasounds were taken. Dr. Brewer further stated that there is a “pretty clear-cut” standard of care about establishing a gestational age and not getting away from it without a really good reason. Furthermore, in her opinion, there was no medical justification for either of Ms. Marroy’s inductions. She did not agree with the decision to induce labor based on a history of two episodes of decreased fetal movement that were not current. Dr. Brewer testified that it was not clear to her that it was established that the baby had cord compression. Additionally, she stated that it was common for mothers to complain about little or no fetal movement. In conclusion, Dr. Brewer testified that the medical review panel was of the opinion that this situation looked like one where there was an elective induction without an established maternal or fetal indication and that the baby got sick as a premature infant can, and one was the proximate cause of the other. She further testified that it was the medical review panel’s opinion that Dr. Hertzak breached the applicable standard of care.
On cross examination, Dr. Brewer acknowledged that she did not believe that there is an absolute guideline on this particular issue. There are guidelines for practice, but they are not absolute standards, because there can be exceptions. She stated that it is an accepted standard that a doctor does not perform inductions of labor on infants less than term unless there is an established medical indication. Dr. Brewer admitted that there are instances where the neonatal environment is *314 healthier for the infant than the in útero environment, but she did not believe that this was one of them. She also testified that the risk of respiratory distress in a child in this situation was only about five percent.
|10Dr. Sheryl Rowland, accepted at trial as an expert in the field of pediatrics, was Collin’s treating pediatrician after his birth. She testified that she first saw Collin on June 27, 2000, having been called in because he was having difficulty breathing. Dr. Rowland testified that she agreed with the 35-week gestational age assessment given to Collin after his birth by the nurse in the delivery room. She stated that a term baby is 37 to 38 weeks. She testified that Collin was dusky at delivery, indicating respiratory distress, which can be an indication of prematurity. Dr. Rowland’s admitting diagnosis was of a 35-week preterm baby with respiratory distress.
Dr. Judy Zatarain, accepted as an expert in the field of neonatology and pediatrics, testified at trial that she was one of two neonatologists at the hospital when Collin was in the neonatal intensive care unit. Dr. Zatarain first saw Collin about 24 to 36 hours after his birth, and he was critically ill. He was in respiratory distress, which developed into pulmonary hypertension. Given Ms. Marroy’s history and the ultrasounds, it was Dr. Zatarain’s opinion that the 35-week gestational age assessment was accurate. She also stated that anything less than 37 weeks is premature. Dr. Zatarain testified that she later found out that the hospital’s nurse practitioner assessed the baby at 37 weeks, in contrast to the 35-week gestational age given by the delivery room nurse.[6] If she had known of the discrepancy, Dr. Zata-rain would have asked for a reassessment. Dr. Zatarain admitted to discrepancies in the charting of Collin’s medical records. However, in her opinion, it was more likely than not that the medical issues suffered by Collin were because of prematurity.
The defense also presented expert testimony. Dr. Victor Lunyong, an expert in the field of neonatology, reviewed the medical records in this matter. He testified that it was his opinion that the gestational age at birth was at least 37 to 38 weeks, and not 35 to 36 weeks, calling that a “physical impossibility.” He believed that the health care providers in this matter ignored the baby’s ^overall weight, head circumference, and length. It was his opinion that they did not pay attention to all the details. Dr. Lunyong stated that the baby’s head circumference was above the 97th percentile for a 35-week old gestational age baby and that was not possible unless something else was wrong, which was not the case here.
Dr. Jason Collins, an expert in the field of obstetrics and gynecology, also testified in this matter for Dr. Hertzak. Dr. Collins testified that his review of the records showed two documented episodes of decreased fetal movement and another possible undocumented episode. In his opinion, the baby was signaling that something was bothering him, and these complaints had to be taken seriously. Dr. Collins further testified that there are many different styles of practice from institution to institution and that there are different schools of thought as to how to evaluate a fetus with such symptoms. He stated that there is not one national standard of care regarding these issues and probably not one standard of care for the New Orleans area.
*315 When discussing variable decelerations, Dr. Collins testified that most physicians use three decelerations in a row as an indicator of when to intervene. Dr. Collins testified that in Collin’s case, cord compression was consistent with what he found in the medical records. He saw clear cord compression patterns on the fetal heart rate during the second induction. It was Dr. Collins’s opinion that if the baby had not been delivered when it was, he would have been a lot sicker a week or two later. Cord compression, over time, could have caused more lung damage or even death. He believed that Dr. Hertzak was prudent in delivering on June 26, 2000, and that it would have been imprudent not to deliver at that time. When Dr. Collins was corrected that the delivery was vaginal and not by caesarian section, he stated that the correction did not change his opinion.
The last medical expert to testify was the defendant Dr. Hertzak. Initially called on cross-examination by Ms. Mar-roy, Dr. Hertzak testified that he calculated Ms. Marroy’s due date using her last menstrual period of October 15, 11g1999, and the obstetrical calendar to arrive at the date of July 23, 2000. He testified that 40 weeks is the distinction between a term pregnancy and post-term pregnancy. Dr. Hertzak testified that term is anywhere from 37 to 40 weeks, and Collin’s delivery was three days short of 37 weeks. Dr. Hertzak testified that he did not change any due dates, but had established a window for delivery based on the date of Ms. Marroy’s last menstrual period as well as her ultrasounds. Dr. Hertzak stated that the window was between June 26, 2000, and July 23, 2000. He testified that he did not induce a premature child.
On direct examination, Dr. Hertzak also testified that when Ms. Marroy reported her last menstrual period of October 15, 1999, he used that as “the starting point.” He testified that during her regular visit in July 1999, Ms. Marroy was given a new prescription for birth control pills. Dr. Hertzak stated that going on and off birth control pills can cause “havoc hormonally” and dysfunctional bleeding. Dr. Hertzak further stated that Ms. Marroy called him on the evening of May 18, 2000, reporting decreased fetal movement, and an ultrasound was performed. There was another complaint on June 6, 2000. Dr. Hertzak testified that a second episode is significant. He stated that the mother was healthy, so he believed that something was going on with the baby, particularly when the baby was previously kicking and active and then one day that activity suddenly decreases. Dr. Hertzak testified that such a decrease could be indicative of cord compression. The fetal monitor strip from the non-stress test on June 9, 2000, showed two variable decelerations, which told him that the umbilical cord was compressed on two occasions during the test. With another episode on June 18, 2000, Dr. Hert-zak testified that he opted for the first induction. He testified that by the date of Ms. Marroy’s last period, the baby had a gestational age of 35 weeks. At that age, survivability was more than ninety percent, and the chance for severe respiratory distress was down to ten to fifteen percent. Dr. Hertzak testified that he did not think they should take any more risks. If the lungs were premature, he stated, the nursery could treat that, but could not treat a dead baby. Dr. Hertzak testified that the previous induction was stopped for several | ^reasons. After approximately eleven hours, Ms. Marroy was not dilated, and there were no signs of acute fetal distress.
Dr. Hertzak planned for another induction on June 25, 2000. He stated that by the date of Ms. Marroy’s last period, she was 36 weeks and four days and that he began to breathe easier as the baby was *316 on the threshold of term. Dr. Hertzak testified.that he based his decision on everything available to him. Some of the measurements were well into term, and the average of all of them indicated 37 weeks. Because there was clear evidence of intermittent and repetitive cord compression, he had no doubt about inducing at that time. According to Dr. Hertzak, the ultrasound indicated that the baby’s weight was seven pounds and seven ounces, so there was only a five percent chance of moderate to severe respiratory distress. He testified that he weighed this information against the odds of a possible stillbirth. Dr. Hertzak testified that he would not have done anything differently.
Considering the evidence presented at trial, Ms. Marroy argues that she clearly established the applicable standard of care. Therefore, according to Ms. Marroy, the jury’s answer to the first interrogatory was manifestly erroneous, and because the jury was clearly wrong as to this interrogatory, we should ignore the jury’s response to the second interrogatory and throw out the entire verdict. Upon our review of the record, we find that there was substantial evidence presented at trial regarding the applicable standard of care, and the jury’s finding in this regard was manifestly erroneous. However, we also find that the record contains sufficient evidence for the jury to conclude that Dr. Hertzak did not breach the standard of care required of him.
Dr. Brewer testified in accordance with the medical review panel opinion. Dr. Za-tarain and Dr. Rowland were of the opinion that Collin was delivered prematurely. However, Dr. Hertzak testified that he never changed Collin’s due date and that he did not deliver a premature baby. Dr. Lunyong and Dr. Collins testified that they did not believe that Collin was premature. The jury could have reasonably believed the testimony of Dr. Hertzak and his witnesses over the h ¿testimony of the witnesses presented by Ms. Marroy. Thus, the jury was faced with two different, but permissible views of the evidence, and its choice between them cannot be clearly wrong. See Rosell, 549 So.2d at 844. Therefore, upon a thorough review of the record, we can find no manifest error in the jury’s determination that Dr. Hert-zak did not breach the applicable standard of care.
Lastly, Ms. Marroy assigns as error the trial court’s failure to grant her motion for JNOV or, alternatively, for a new trial. Ms. Marroy contends that the jury verdict was clearly wrong considering the evidence presented at trial.
A JNOV is a procedural device authorized by LSA-C.C.P. art. 1811 where the trial judge may correct a legally erroneous jury verdict by modifying the jury’s finding of fault or damages, or both. Davis v. Wal-Mart Stores, Inc., 00-0445 (La.11/28/00), 774 So.2d 84, 89. A JNOV is warranted when the facts and inferences point so strongly and overwhelmingly in favor of one party that the court believes that reasonable jurors could not arrive at a contrary verdict. The motion should be granted only when the evidence points so strongly in favor of the moving party that reasonable persons could not reach different conclusions, not merely when there is a preponderance of evidence for the mover. If there is evidence opposed to the motion that is of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motion should be denied. In making this determination, the court should not evaluate the credibility of the witnesses and all reasonable inferences or factual questions should be resolved in favor of the non-moving party. Id.
The rigorous standard of a JNOV is based upon the principle that when there *317 is a jury, the jury is the trier of fact. Trunk v. Medical Center of Louisiana at New Orleans, 04-0181 (La.10/19/04), 885 So.2d 534, 537. Simply stated, if reasonable persons could have arrived at the same verdict given the evidence presented to the jury, then a JNOV is improper. Cavalier v. State, ex rel. Dept. of Transp. and Development, 08-0561 (La.App. 1 Cir. 9/12/08), 994 So.2d 635, 644.
11fiThe standard to be applied by the appellate courts in reviewing the grant or denial of a JNOV is whether the trial court’s findings were manifestly erroneous. Belle Pass Terminal, Inc. v. Jolin, Inc., 92-1544, 92-1545 (La.App. 1 Cir. 3/11/94), 634 So.2d 466, 492, writ denied, 94-0906 (La.6/17/94), 638 So.2d 1094.
Considering all of the evidence and the reasonable inferences to be made therefrom in favor of Dr. Hertzak, we cannot say that the trial court was manifestly erroneous in refusing to grant Ms. Mar-roy’s motion for JNOV. The evidence did not point so strongly in favor of Ms. Mar-roy that reasonable persons could not reach a different conclusion. As such, the trial court did not err in denying the JNOV.
Alternatively, Ms. Marroy moved for a new trial. The motion for a new trial requires a less stringent test than a motion for a JNOV in that such a determination involves only a new trial and does not deprive the parties of their right to have all disputed issues resolved by a jury. Broussard v. Stack, 95-2508 (La.App. 1 Cir. 9/27/96), 680 So.2d 771, 781. A new trial shall be granted if the jury verdict appears to be clearly contrary to the law and the evidence. LSA-C.C.P. art. 1972(1). Also, a trial court may grant a new trial if there is some good ground therefor. LSA-C.C.P. art. 1973. When considering a motion for a new trial, the trial court has wide discretion. LSA-C.C.P. art. 1971.
In considering a motion for a new trial, the trial court is free to evaluate the evidence without favoring either party, drawing its own conclusions and inferences and evaluating the credibility of the witnesses to determine if the jury has erred in giving too much credence to an unreliable witness. Hunter v. State ex rel. LSU Medical School, 05-0311 (La.App. 1 Cir. 3/29/06), 934 So.2d 760, 764, writ denied, 06-0937 (La.11/3/06), 940 So.2d 653. The trial court’s discretion in ruling on a motion for new trial is great, and its decision will not be disturbed on appeal absent an abuse of that discretion. - However, the fact that a determination on a motion for new trial involves judicial discretion does not imply that the trial court can freely interfere with any verdict with which 1 lfiit disagrees. Fact finding is the province of the jury, and the trial court must not overstep its duty in overseeing the administration of justice and unnecessarily usurp the jury’s responsibility. A motion for new trial solely on the basis of being contrary to the evidence is directed squarely at the accuracy of the jury’s factual determinations and must be viewed in that light. Thus, the jury’s verdict should not be set aside if it is supportable by any fair interpretation of the evidence. Hunter, 934 So.2d at 764-65.
In this matter, although the trial court stated that it would have decided the case differently, it acknowledged in its oral reasons that reasonable minds could have reached the jury’s conclusion.[7] The trial court therefore denied the motion. We are constrained to agree. The jury’s findings were largely based on credibility determinations and weighing of conflicting *318 evidence. Although the evidence was conflicting, two permissible views of the evidence existed, and the factfinder’s choice between them cannot be manifestly erroneous or clearly wrong. See Rosell, 549 So.2d at 844. The jury’s verdict was clearly supported by a fair interpretation of the evidence, and there was ample evidence heard by the jury that could have led it to conclude that Dr. Hertzak did not breach the applicable standard of care. Accordingly, we can find no abuse of the trial court’s discretion in its judgment denying Ms. Marroy’s motion for new trial.
CONCLUSION
For the reasons stated herein, we affirm the judgments of the trial court dismissing Ms. Marroy’s petition and denying her motion for judgment notwithstanding the verdict or, in the alternative, for a new trial. Costs of this appeal are assessed to the plaintiff, Angele D. Marroy, individually and as the administrator of the estate of her minor child, Collin Andrew Marroy.
AFFIRMED.

. The child’s father, Harry A. Marroy, was originally named as a petitioner in this matter, but he and plaintiff later divorced. Thereafter, plaintiff was appointed curator and tutrix of the minor child, and Mr. Marroy was dismissed from this action on February 22, 2010.

. Although the judgment denying the motions for JNOV and new trial was signed on April 27, 2010, and plaintiff filed her motion for appeal on May 26, 2010, a judgment rendered in accordance with the jury verdict was not signed until February 14, 2011.

.Ardoin is more like the instant case than that of Newsom v. Lake Charles Memorial Hosp., 06-1468 (La.App. 3 Cir. 4/4/07), 954 So.2d 380, writ denied, 07-0903 (La.6/15/07), 958 So.2d 1198, cited by Ms. Marroy. In Newsom, although the jury also answered in the negative a similar interrogatory regarding the standard of care, the jury stopped there and did not address the remaining issues. Accordingly, we find Newsom distinguishable.

. We note that the jury in this matter asked for clarification regarding the first interrogatory.

. Collin's pediatrician also testified at trial, as did Ms. Marroy.

. On cross examination, Dr. Zatarain testified that the nurse practitioner has more training than regular nurses, and she is the one who trains the delivery room nurses on how to do the assessment exam after birth.

. Although the trial court questioned the credibility of Dr. Collins, it recognized that based on the totality of the evidence presented to it, the jury believed that Dr. Hertzak did *318 not breach the standard of care required of him with regard to Ms. Marroy and Collin. The court stated, "Whether the court agrees or disagrees with it is [of] no moment. Reasonable minds could have come to that conclusion.”