STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

06-0171

DAVID BRADLEY ARDOIN, ET UX.

VERSUS

DR. DOUGLAS MCKAY

************

APPEAL FROM THE
THIRTEENTH JUDICIAL DISTRICT COURT,
PARISH OF EVANGELINE, NO. 64511-A,
HONORABLE JOHN NAVARRE, DISTRICT JUDGE

************

JIMMIE C. PETERS
JUDGE

************

Court composed of Chief Judge Ulysses Gene Thibodeaux and Judges Jimmie C.
Peters and J. David Painter.

AFFIRMED.

Jay Pucheu
Attorney at Law
Post Office Box 310
Marksville, LA 71351
(318) 253-5080
COUNSEL FOR PLAINTIFFS/APPELLANTS:
    David Bradley Ardoin and Elizabeth Ardoin

Marc W. Judice
Judice & Adley
Post Office Drawer 51769
Lafayette, LA 70505
(337) 235-2405
COUNSEL FOR DEFENDANT/APPELLEE:
    Dr. Douglas McKay

PETERS, J.

The plaintiffs in this medical malpractice case, David Bradley Ardoin and his wife, Elizabeth Ardoin, appeal a jury verdict rejecting their claim against the defendant, Dr. Douglas McKay. For the following reasons, we affirm the trial court judgment in all respects.

## DISCUSSION OF THE RECORD

This litigation arises from a September 23, 1997 surgical procedure performed on Mr. Ardoin by Dr. McKay at the Savoy Medical Center in Mamou, Evangeline Parish, Louisiana. However, Mr. Ardoin's extensive medical history with Dr. McKay actually began in 1989 when the doctor, an orthopedic surgeon, performed a laminectomy and discectomy for a bulging disc at L5-S1. This initial surgical procedure proved successful, and Mr. Ardoin returned to work.

For the next four years, Mr. Ardoin saw Dr. McKay occasionally for pain in his legs or back. However, Mr. Ardoin's involvement in a 1993 oilfield accident caused him to return to Dr. McKay with complaints of more severe pain in his neck and lower back. Over the period of the next three years, Dr. McKay treated Mr. Ardoin for his complaints and referred him to a number of other medical specialists in an effort to pinpoint the cause of his pain and symptoms. The other medical specialists included Dr. Robert Rivet, a neurosurgeon; Dr. Steven Snatic, a neurologist; Dr. Robert Franklin, a physiatrist; Dr. John Humphries, an orthopedic surgeon; Dr. James Domingue, a neurologist; and Dr. Thomas Bertuccini, a neurosurgeon. Although Mr. Ardoin related complaints of severe and constant pain in the neck and low back, these physicians were unable to find the source of his complaints. MRIs, bone scans, an EMG, a nerve conduction study, and a myleogram were all negative for isolating the cause of his constant pain. In fact, only Dr. Bertuccini would hazard a

recommendation for follow-up treatment. Based on the longevity of the symptoms, he recommended that Mr. Ardoin undergo a lumbar discectomy.

Despite this inability to isolate the cause of Mr. Ardoin's symptoms, Dr. McKay believed Mr. Ardoin to be totally disabled and continued to search for a medical reason for, and a solution to, his complaints. Agreeing with Dr. Bertuccini's recommendation as to the next logical step, Dr. McKay concluded that Mr. Ardoin would be a good candidate for a new procedure with which he had been experimenting that entailed using a device of his own invention which had proven successful in its limited use. The device was a pie-shaped titanium steel "wedge," which, when surgically placed between the vertebrae of a patient, helped decompress the intervertebral space and allow it to expand to its normal size. The wedge contained "teeth" on the surface to help keep it in place once inserted.[1]

On three different occasions during the summer of 1997, Dr. McKay discussed with Mr. Ardoin and his wife the prospect of performing a fusion to stabilize the spine and inserting a wedge or wedges at the L4-5 level. Mr. Ardoin opted for the procedure, which was performed on September 23, 1997. According to Dr. McKay, throughout the surgery he was able to see directly into Mr. Ardoin's back, observe the exposed nerve, and insert the wedges exactly where they should be placed. The doctor believed the surgery to be a success although an intra-operative fluoroscopy film revealed that one of the wedges was protruding two millimeters into the spinal canal.

---

[1]The device Dr. McKay had designed and was using was not yet approved by the FDA, but, subsequent to September 23, 1997, the date of the surgery involved in this case, Johnson & Johnson obtained the licensing right for the device (differing only in respect to the material used to form it), and it became FDA approved.

For the next fourteen months, Dr. McKay followed Mr. Ardoin's progress and thought his patient was progressing. However, because of continued complaints from the patient, Dr. McKay referred him to Dr. John D. Jackson, a Metairie, Louisiana neurosurgeon, for a second opinion.

Dr. Jackson first saw Mr. Ardoin on December 3, 1998. According to Dr. Jackson, Mr. Ardoin informed him that, immediately after Dr. McKay's surgery, he knew his back was not corrected and that his pain was still present. Mr. Ardoin's initial complaint to Dr. Jackson was that of pain extending from his neck and upper extremities through his low back and lower extremities. Dr. Jackson reviewed x-rays of the lower back taken in December of 1997 and interpreted these to reflect a projection of the wedges posteriorly into the spinal canal at the L4-5 level. Dr. Jackson's own x-ray revealed a six millimeter protrusion of a wedge into the spinal canal.

Dr. Jackson initially informed Mr. Ardoin that he believed the lower back pain was caused by the protruding wedge. However, when he reviewed the results of a post-operative normal EMG study, Dr. Jackson decided to initially treat Mr. Ardoin's complaints conservatively.

Dr. Jackson's continued conservative treatment for the next year and one-half resulted in no improvement in Mr. Ardoin's symptoms. On May 31, 2000, Dr. Jackson performed surgery on Mr. Ardoin wherein he removed the protruding wedge from the disc space at L4-5 and decompressed the nerve roots by replacing the wedge with another type of spacer. Mr. Ardoin's pain was not resolved by this subsequent surgery.

On August 17, 2000, the Ardoins filed a request for review of their malpractice claim by a medical review panel as provided for in La.R.S. 40:1299.47. In their claim, they asserted that Dr. McKay had committed medical malpractice by improperly placing the wedges during the surgical procedure of September 23, 1997, and by not informing them of the possibility of migration of the wedges. After reviewing the evidence presented, the medical review panel found no medical malpractice on the part of Dr. McKay. Specifically, it found that the condition corrected by Dr. Jackson's surgery resulted from migration of the wedges, and not improper placement; that the Ardoins were properly informed of the procedure and the possible complication of migration; that the use of the non-FDA approved wedges was not a breach of the standard of care required of Dr. McKay; and that the doctor's post-operative decision to wait and see if the complaints of pain would resolve themselves was an acceptable course of action and one similarly followed by Dr. Jackson. The medical review panel was comprised of three Lafayette, Louisiana orthopedic surgeons—Dr. John E. Cobb, Dr. David Muldowny, and Dr. John R. Budden. All three of the physicians testified at trial as witnesses for Dr. McKay.

After the medical review panel's decision, the Ardoins filed the instant medical malpractice suit against Dr. McKay. In this suit, they again asserted that Dr. McKay failed to obtain informed consent for the procedure and that he improperly placed the wedges during the surgical procedure. After a jury rejected their claims, the Ardoins perfected this appeal.

## APPLICABLE STANDARD OF REVIEW

As a preliminary matter, we must consider and respond to the Ardoins' contention, ranked in their appellate brief as their "principle argument," that the

4

appeal should be reviewed *de novo*. This contention is based on the interpretation of the jury verdict as being manifestly wrong and so contradictory that it should be ignored.

The verdict form provided to the jury was proposed by the Ardoins and was still labeled as "**PLAINTIFF'S PROPOSED JURY VERDICT FORM**" when it was returned to the trial court after the jury reached its verdict. The relevant part of this verdict form appears as follows:

> 1. Did plaintiff establish by a preponderance of evidence the standard of care applicable to Dr. McKay?  **Yes** ___  **No** _✓_
>
> 2. Did Dr. McKay breach the standard of care?  **Yes** ___  **No** _✓_
>
> (If "Yes", continue to No. 3.  If "No", report your verdict.)

In compliance with the instruction following the second interrogatory, the jury returned its verdict without answering the remaining interrogatories. The verdict was unanimous.

The questions raised by the jury verdict are the focus of both of the Ardoins' assignments of error. In those assignments of error, they assert:

> (1)  The jury committed manifest error in finding that the plaintiffs failed to prove the standard of care where the panel members, a treating neurosurgeon and the defendant himself agreed on the standard of care in the testimony presented.
>
> (2)  The jury committed manifest error in answering the second Jury interrogatory when its answer to the first precluded an answer.

Basically, they argue that we should find manifest error in the responses to both interrogatories, perform a *de novo* review of the record, find that Dr. McKay breached the standard of care applicable to him, and award them damages for that breach.

5

In making this argument, they rely on the principle of appellate review as stated in *Oubre v. Eslaih*, 03-1133 (La. 2/6/04), 869 So.2d 71. In that case, the supreme court stated that, "if a court finds that the trial court committed a reversible error of law or manifest error of fact, the court of appeal must ascertain the facts *de novo* from the record and render a judgment on the merits." *Id.* at 76. The Ardoins argue that they established the standard of care through the testimony of at least five doctors, including Dr. McKay himself. That being the case, the Ardoins assert that the jury's answer to the first interrogatory was manifestly erroneous and that we should ignore the response to the second interrogatory because, assuming the jury believed that no standard of care had been established, it should not have answered the second interrogatory.

We agree that the standard of care on both the question of informed consent and the placing of the wedges was well established by the trial record. However, there are a number of reasonable explanations for the jury's responses to the interrogatories. One is that the jury did not appreciate the precise meaning of the first interrogatory. That is to say, the jury could well have thought that the two interrogatories were asking essentially the same question. Another is that the jury believed the standard of care was established, but by Dr. McKay, and not by the Ardoins.

A third and more likely explanation for the apparent inconsistency is that the parenthetical instruction following the second interrogatory, (If "Yes", continue to No. 3. If "No" report your verdict.), was itself confusing. A negative answer to the first interrogatory essentially terminated the litigation and eliminated the need to answer the second interrogatory. However, because it contained no parenthetical

6

instruction similar to that following the second interrogatory, the jury could have construed the instruction as applying to both interrogatories and could have concluded that a verdict for the doctor required it to answer "No" to both interrogatories.[2]

In any event, whatever the jury's confusion may have been as to the first interrogatory, there can be no doubt it understood the second. This interrogatory asked for the jury's verdict on the heart of the case—whether Dr. McKay breached the standard of care applicable to his treatment of Mr. Ardoin. The jury's answer to that question and its compliance with the parenthetical instruction following that interrogatory leave no doubt concerning the jury's belief on this issue.

Misleading or confusing interrogatories may constitute reversible error, but the manifest error standard of appellate review still applies except where the jury interrogatories are so inadequate or incorrect as to preclude the jury from reaching a verdict based on the law and the facts. *Doyle v. Picadilly Cafeterias*, 576 So.2d 1143 (La.App. 3 Cir. 1991). We do not find that the exception applies in this case. Thus, we reject the Ardoins' argument that we should review the verdict *de novo.*

Having concluded that the standard of care applicable to Dr. McKay was established, we turn to the issue of whether the jury committed manifest error in concluding that Dr. McKay did not breach that standard of care. In addressing this issue, we note that the Ardoins' assignments of error relate solely to the answers to the interrogatories and their request for a *de novo* review. In doing so, they do not particularly specify, as an alternate assignment of error, manifest error on the merits

_____

[2]Neither the jury charges nor the closing arguments directed the jury's attention to the interrogatories specifically. The closest that anyone came to guiding the jurors in their consideration of the specific interrogatories was when one of the attorneys told them to "follow the instructions on the sheet."

7

of the jury's findings on the standard of care issue. Under Uniform Rules—Courts of Appeal, Rule 1-3, this court "will review only issues which were submitted to the trial court and which are contained in specifications or assignments of error, unless the interest of justice clearly requires otherwise." Thus, the question arises whether a review based on manifest error is properly before this court. We have answered that question in the affirmative for several reasons.

One reason is that nowhere in his appellate brief does Dr. McKay take the position that, if we reject the request for a *de novo* review, that action would terminate the litigation. Instead, he treats the appeal in his brief as addressing manifest error and responds accordingly. Additionally, we are mindful of the supreme court's decision in *Nicholas v. Allstate Insurance Co.*, 99-2522, (La. 8/31/00), 765 So.2d 1017, where the supreme court concluded that the appellate court should have addressed a particular issue in that litigation even though it had not been assigned as error. In reaching that conclusion, the supreme court cited La.Code Civ.P. art. 2129, which provides that an assignment of error is not necessary in any appeal, and La.Code Civ.P. art. 2164, which provides that an appellate court "shall render any judgment which is just, legal, and proper upon the record on appeal." The *Nicholas* court also emphasized that Uniform Rules—Courts of Appeal, Rule 1-3, was applicable "unless the interest of justice clearly requires otherwise."

Liberally construing the Ardoins' argument in brief, we can glean from it that they are also challenging the verdict from the standpoint of manifest error as to its findings on the merits that there was no breach of the standard of care. Therefore, we will now address that issue.

**OPINION**

8

Louisiana Revised Statutes 9:2794 sets forth the burden of proof required in a medical malpractice case and provides in pertinent part:

> A. In a malpractice action based on the negligence of a physician licensed under R.S. 37:1261 et seq., . . . the plaintiff shall have the burden of proving:
>
> (1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians, dentists, optometrists, or chiropractic physicians licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; and where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians, dentists, optometrists, or chiropractic physicians within the involved medical specialty.
>
> (2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill.
>
> (3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.

Our review of the factual findings of the jury must be conducted in accordance with the familiar precept announced by our supreme court that, "[i]f the trial court or jury's findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse, even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Sistler v. Liberty Mut. Ins. Co.*, 558 So.2d 1106, 1112 (La.1990). Also, "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong." *Rosell v. ESCO*, 549 So.2d 840, 844 (La.1989).

"[E]xpert witnesses who are members of the medical profession are necessary sources of proof in medical malpractice actions to determine whether the defendant doctor possessed the requisite degree of skill and knowledge, or failed to exercise

reasonable care and diligence." *Martin v. E. Jefferson Gen. Hosp.*, 582 So.2d 1272, 1277 (La.1991). "The determination of an expert's credibility is also a factual question subject to the manifestly erroneous/clearly wrong standard of review." *Id.*

### *Informed Consent Issue*

With regard to the question of informed consent, La.R.S. 40:1299.40(A)(1) provides:

> Notwithstanding any other law to the contrary, written consent to medical treatment means a handwritten consent to any medical or surgical procedure or course of procedures which: sets forth in general terms the nature and purpose of the procedure or procedures, together with the known risks, if any, of death, brain damage, quadriplegia, paraplegia, the loss or loss of function of any organ or limb, of disfiguring scars associated with such procedure or procedures; acknowledges that such disclosure of information has been made and that all questions asked about the procedure or procedures have been answered in a satisfactory manner; and is signed by the patient for whom the procedure is to be performed, or if the patient for any reason lacks legal capacity to consent by a person who has legal authority to consent on behalf of such patient in such circumstances. Such consent shall be presumed to be valid and effective, in the absence of proof that execution of the consent was induced by misrepresentation of material facts.

To meet the burden of proof in an informed consent case, a plaintiff must prove the existence of a material risk unknown to the patient, a failure on the part of the physician to disclose the risk, that disclosure of the risk would have led a reasonable person in the plaintiff's position to reject the procedure or to choose a different course of treatment, and injury arising from the procedure. *Fremin v. Continental Ins. Co.*, 02-1157 (La.App. 3 Cir. 3/5/03), 839 So.2d 1137, *writs denied*, 03-966, 03-979, 03-981 (La. 6/27/03), 847 So.2d 1271, 1272. With regard to the materiality issue, the supreme court in *Hondroulis v. Schuhmacher*, 553 So.2d 398, 412 (La.1989), stated:

> The determination of materiality is a two-step process. The first step is to define the existence and nature of the risk and the likelihood of its occurrence. "Some" expert testimony is necessary to establish this

aspect of materiality because only a physician or other qualified expert is capable of judging what risk exists and the likelihood of occurrence. The second prong of the materiality test is for the trier of fact to decide whether the probability of that type harm is a risk which a reasonable patient would consider in deciding on treatment. The focus is on whether a reasonable person in the patient's position probably would attach significance to the specific risk. This determination of materiality does not require expert testimony.

In reviewing an informed consent decision, we must not substitute our own factual findings for that of the trier of fact, and the evidence must be viewed in the light most favorable to the party who prevailed before the trier of fact. *Thibodeaux v. Jurgelsky*, 04-2004 (La. 3/11/05), 898 So.2d 299.

The Ardoins argue that Dr. McKay failed to inform them of the existence of posterior migration of the wedge and that such a possibility was a material risk which would have lead Mr. Ardoin to reject the procedure and choose another course of treatment. Put another way, the Ardoins argue that Dr. McKay should have specifically informed them that posterior migration was a possibility of the procedure and that it might cause nerve irritation. The evidentiary record is clear that Dr. McKay did not make the specific disclosure suggested by the Ardoins.

Dr. McKay testified that he met with the Ardoins three times before the surgery and that at those meetings he used illustrations to explain the procedure, invited questions, and answered all questions that were asked. Four days before the surgery, Mr. Ardoin signed four different consent forms authorizing Dr. McKay to perform the anticipated procedure. One of the forms contained general warnings that the wedge or wedges "may sink into the bone," or "may slip," or "may become loose." It further warned that the wedges could cause bleeding, leakage of spinal fluid, allergic reaction, or infection. Furthermore, it warned that the infection could result in blood clots, additional surgical intervention, and neurological weakness. However, one of

11

the forms contained the statement that, should a wedge slip, it "should slip anteriorly and not cause any problems," but made no mention of posterior slippage.

In support of their position, the Ardoins submitted the testimony of Dr. Cobb and Dr. Budden. Dr. Cobb testified that, when the surgeon places the wedge in the intervertebral space from the back, or posteriorly, he should expect any migration to be posteriorly. Thus, he always informs his patient that the chance of migration is greater posteriorly than anteriorly. Dr. Budden also testified that the risk of posterior migration into the spinal canal was one which should be related to the patient, but he did not believe that it was a significant risk.

On the other hand, Dr. Muldowny, whose orthopedic surgical practice emphasizes spine surgery, testified that the applicable standard of care does not require a specific warning that the instrumentation might migrate and pinch a nerve. He felt it would suffice "to make a more general statement that there may be . . . a problem with the instrumentation that might damage a nerve that might require additional surgery."

Obviously, the jury chose to believe Dr. Muldowny, and we find no manifest error in that conclusion with regard to the issue of informed consent. That is to say, we cannot say that the jury erred in concluding that a specific disclosure of the risk of posterior migration, in those terms, would have led a reasonable person in Mr. Ardoin's position to reject the procedure or to choose a different course of treatment. This aspect of the Ardoins' argument has no merit.

### Insertion of Wedges Issue

All of the physicians who testified stated that it would be a breach of the standard of care required of Dr. McKay if he placed the wedges in such a manner as

to touch a nerve. Specifically, had the wedges been placed where they protruded six millimeters into the spinal canal, that would have been a breach of the standard of care. Additionally, there was general agreement among the physicians who testified that migration is one of the hazards of the procedure and that the existence of migration does not indicate a breach of the standard of care.

In their opening statement, the Ardoins informed the jury that they would prove by a preponderance of the evidence that the wedges were initially placed by Dr. McKay in a position where they were protruding into the spinal canal and irritating nerve roots. They further asserted that the wedges continued to irritate the nerve roots until their removal by Dr. Jackson. It is not disputed that Dr. Jackson removed the wedges from a position where one was protruding six millimeters from its proper position and was impinging on a nerve. However, no physician testified that the wedges were protruding six millimeters when placed by Dr. McKay. Thus, the question is whether the Ardoins established by a preponderance of the evidence that Dr. McKay's initial placement resulted in nerve root irritation, regardless of the extent of protrusion.

Dr. Stephen Pflug, a radiologist, testified for the Ardoins and is basically the only physician who testified that the initial placement breached the standard of care. He testified that, when he examined two x-ray images ordered by Dr. McKay on the date of the surgery, he observed that the wedge protruded approximately two millimeters into the spinal canal. However, he acknowledged on cross-examination that the normal posterior projection of the annulus fibrosis is about two millimeters, and, therefore, he could not state for a fact that the two millimeter protrusion

13

impinged on a nerve. Additionally, Dr. Muldowny testified that the two millimeter protrusion was not a breach of the appropriate standard of care.

According to Dr. Muldowny, the posterior margin of the spinal canal is not necessarily the same as the posterior margin of the bone. He suggested that there could be additional material such as a fibrous cartilaginous implate that sticks beyond the bone that x-rays would not detect. Thus, the x-rays may provide a false picture concerning the location of the wedge, even to the extent of showing that it appears to be placed right on the edge of a nerve root. He testified that the surgeon performing the procedure can clearly see the nerve root and has a much better view of the wedge's specific location in relation to that nerve root. He further noted that the outside portion of the disc itself, the annulus fibrosis, normally projects into the canal about two millimeters. In his opinion, Dr. McKay placed the wedges properly during surgery, and at least one migrated thereafter.

Even Dr. Jackson was of the opinion that Dr. McKay placed the wedges in proper position and that they migrated thereafter. Although he testified that, at the time he performed surgery to remove and replace the wedges, one had migrated backwards into the spinal canal and slightly laterally to the edge of the dura and was encroaching on the neural foramen, he further stated that "[t]hose things sometimes move" and that "that's just one of the complications that can occur."

Given the medical testimony, we find no error in the jury's determination that Dr. McKay did not breach the standard of care in placing the wedges during the September 23, 1997 surgery.

## PRESCRIPTION

14

After trial and before appeal, Dr. McKay filed a peremptory exception of prescription, urging the application of the one-year prescriptive period established in La.R.S. 9:5628. The jury's verdict mooted that issue at the trial level, and the trial court never considered it. Dr. McKay has again urged that exception on appeal. Because we affirm the jury's verdict in full, we find it unnecessary to address that exception.

## DISPOSITION

For the foregoing reasons, we affirm the trial court judgment in all respects. We tax all costs of this appeal to David Bradley Ardoin and Elizabeth Ardoin.

**AFFIRMED.**