# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 12-277


CAMILLE LANDRY, ET AL.

VERSUS

PSA OF LAFAYETTE, LLC, ET AL.


**********

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. C-20045188
HONORABLE EDWARD B. BROUSSARD, DISTRICT JUDGE

**********

## MARC T. AMY
## JUDGE

**********

Court composed of John D. Saunders, Marc T. Amy, and J. David Painter, Judges.

**AFFIRMED.**


Saunders, J., dissents and assigns reasons.

Eve B. Masinter
Breazeale, Sachse & Wilson
909 Poydras, Suite 1500
New Orleans, LA   70112-4004
(504) 619-1800
COUNSEL FOR DEFENDANT/APPELLEE:
     Pediatric Services of America, Inc.

Roy C. Cheatwood
Monica A. Frois
Brandy N. Sheely
Baker Donelson Bearman Caldwell & Berkowitz, P.C.
201 St. Charles Avenue, Suite 3600
New Orleans, LA   70170-3600
(504) 566-5200
COUNSEL FOR DEFENDANT/APPELLEE:
     Pediatric Services of America, Inc.

**J. Michael Veron**
**J. Rock Palermo, III**
**Veron, Bice, Palermo & Wilson**
**Post Office Box 2125**
**Lake Charles, LA   70602-2125**
**(337) 310-1600**
**COUNSEL FOR DEFENDANTS/APPELLEES:**
 **Monica Ann Frois**
 **Pediatric Services of America, Inc.**

**William W. Stagg**
**Ryan M. Goudelocke**
**Durio, McGoffin, Stagg & Ackermann, P.C.**
**Post Office Box 51308**
**Lafayette, LA   70505-1308**
**(337) 233-0300**
**COUNSEL FOR DEFENDANT/APPELLEE:**
 **Women's and Children's Hospital, Inc.**

**John L. Hammons**
**Annis Cornell Rushing Flournoy**
**Chaile Allen**
**Nelson & Hammons**
**705 Milam Street**
**Shreveport, LA   71101**
**(318) 227-2401**
**COUNSEL FOR PLAINTIFFS/APPELLANTS:**
 **Ryan D. Landry, et al.**

**Marc W. Judice**
**James J. Hautot, Jr.**
**Judice & Adley (A Professional Law Corporation)**
**Post Office Drawer 51769**
**Lafayette, LA   70505-1769**
**(337) 235-2405**
**COUNSEL FOR DEFENDANTS/APPELLEES:**
 **Dr. Cong T. Vo**
 **Dr. Rosaire Josseline Belizaire**

**James P. Lambert**
**Post Office Box 53083**
**Lafayette, LA   70505-3083**
**(337) 261-3737**
**COUNSEL FOR PLAINTIFFS/APPELLANTS:**
 **Camille Landry, et al.**

**Stewart E. Niles, Jr.**
**Michelle A. Bourque**
**Niles, Bourque & Fontana, LLC**
**909 Poydras Street, 35th Floor**
**New Orleans, LA   70112**
**(504) 310-8550**
**COUNSEL FOR DEFENDANT/APPELLEE:**
     **The Administrators of the Tulane Educational Fund**

**Daniel G. Brenner**
**Eric John Miller**
**R. Preston Mansour, Jr.**
**Bolen, Parker, Brenner & Lee, LTD**
**Post Office Box 11590**
**Alexandria, LA   71315-1590**
**(318) 445-8236**
**COUNSEL FOR DEFENDANTS/APPELLEES:**
     **Daniel G. Brenner**
     **R. Preston Mansour, Jr.**

**Nadia de la Houssaye**
**Jones, Walker, Waechter, Poitenvent, Carrère & Denègre, L.L.P.**
**Post Office Box 3408**
**Lafayette, LA   70502-3408**
**(337) 539-7600**
**COUNSEL FOR DEFENDANTS/APPELLEES:**
     **Dr. Vasanth Nalam**
     **Louisiana Patient's Compensation Fund**

**AMY, Judge.**

The plaintiffs filed suit against several treating physicians and a medical equipment provider, seeking damages related to brain damage suffered by their infant daughter. With regard to the medical equipment provider, the plaintiffs primarily asserted that data collected by an apnea monitoring device was negligently lost and/or not delivered to the child's physicians. They alleged that this negligence resulted in the permanent and debilitating damage suffered by their child. Although the jury determined that the medical equipment provider violated a duty owed to the child, it further determined that the violation did not cause injury or damages. Rather, the jury attributed one hundred percent of fault to a nonparty physician. The plaintiffs appeal. For the following reasons, we affirm.

### Factual and Procedural Background

Camille and Ryan Landry are the parents of Tai Landry, born August 16, 2002, at a Lafayette hospital. During this birth admission, Tai was noted to have evidence of Pierre Robin Sequence/Syndrome[1]. According to expert testimony in the record, Pierre Robin is characterized by a child's small chin and a cleft palate. These characteristics pose the risk of the child's tongue moving toward the back of the mouth, obstructing the airway. Tai was admitted to the neonatal intensive care unit of the hospital following her birth and was treated by neonatologists, Dr. Rosaire Belizaire and Dr. Cong Vo. During this two-week birth admission, Tai was noted to have experienced respiratory distress. Although a gastric tube was inserted during this birth admission and the possibility of a tracheotomy was discussed, the latter procedure was not performed.

Tai was ultimately discharged on August 30, 2002, with Dr. Vo prescribing the use of an apnea monitor, which, according to testimony, monitored heart rate and

---

[1] Experts testifying as to Tai's condition referenced it as both a sequence and/or a syndrome.

chest movement within prescribed parameters. According to PSA respiratory therapist Kim Wood, when the baby's breathing or heart rate violated the prescribed parameters, the monitor recorded the event. In the event that the monitor sensed a problem with Tai's respiration, it alerted parents by an alarm so that Tai could be repositioned or roused as needed. When the monitor memory filled to eighty percent of its capacity, a visual alarm alerted family members, who were then to inform PSA so that the event data could be downloaded, processed, and delivered to the ordering physician. In the event that the monitor's memory filled to capacity, an alarm again informed the parents. As described at trial, the monitor, at capacity, would begin to discard certain data pertaining to older events in favor of data from newer events.

In the days following her release from the hospital, Tai visited a number of physicians to evaluate her condition. She began treating with her pediatrician, Dr. Vasanth Nalam, and soon thereafter, was evaluated by a geneticist. Upon recommendation of the geneticist, Tai completed a sleep study at Tulane University Medical Center with Dr. Narong Simakajornboon on September 12th-13th. According to his report, Dr. Simakajornboon recommended the use of supplemental oxygen.

Throughout this period, Tai's monitors alerted Mr. and Ms. Landry of breathing and heart rate issues. It is uncontested that PSA twice responded and delivered downloads to physicians as required. These downloads covered the periods of August 29th-September 10th and September 10th-18th. Much of the present matter concerns data collection for the periods of September 18th-20th (Download 3) and September 20th-24th (Download 4). The record indicates that, during this period, the number and duration of events increased and certain data was lost due to the monitor having reached capacity. At issue in this case is whether PSA responded within an acceptable period of time after being informed that the monitor was reaching capacity

2

and, additionally, whether the delivery of the downloads to the physicians was made. The physicians deny that they received the data.

Within the September 18th–26th period, Tai was twice hospitalized. The first hospitalization occurred on September 19th due to Tai's dehydration stemming from excessive vomiting. In fact, Download 3 was performed during this hospitalization. After Tai returned home following her release from the dehydration hospitalization, the recordable breathing and heart rate events continued. Download 4, which included events from September 20th-24th, was performed. On September 26th, however, Ms. Landry found that Tai had become nonresponsive to her touch when the alarm sounded. Tai was returned to the hospital. According to Ms. Landry, the nurses showed signs of alarm at Tai's condition. Subsequently, Tai underwent a tracheostomy which, according to Ms. Landry, immediately improved her condition.

Although Tai's breathing improved, subsequent testing demonstrated hypoxic brain damage which, the record establishes, is profound and has left Tai fully dependent on others for the remainder of her life. She can neither walk nor speak. Ms. Landry is Tai's primary caretaker.

Mr. and Ms. Landry[2] filed this matter against PSA, Dr. Vo, Dr. Belizaire, and Dr. Nalam.[3] The plaintiffs asserted that the hypoxic brain damage sustained by Tai occurred during the time that PSA was providing apnea monitoring services for the collection and delivery of the information to the physicians. Due to a pre-trial settlement involving Dr. Nalam, the matter proceeded against the Louisiana Patient's Compensation Fund (the LPCF), with Dr. Nalam remaining as a nominal defendant. At the eventual jury trial spanning multiple weeks, the plaintiffs' primary focus was

---

[2] Mr. and Ms. Landry proceeded separately in this matter in light of their divorce during this litigation.

[3] Although the plaintiffs named other defendants, these were released from the suit during pre-trial proceedings.

3

its assertion that PSA was negligent in the performance of its monitoring services and that PSA personnel failed to deliver Downloads 3 and 4 to Tai's physicians. That failure, the plaintiffs contended, prevented surgical intervention which could have prevented Tai's hypoxic brain injury. PSA presented evidence, however, supporting a view that Tai's initial injury occurred in utero and progressively evolved resulting in her ultimate damage.

The verdict sheet considered by the jury included questions pertaining to the alleged negligence and fault of the defendants as well as the alleged negligence and fault of several nonparty physicians. The jury ultimately returned a verdict imposing no liability on the part of the named defendants. While the jury answered in the affirmative to the verdict form question of whether PSA "or any of its employees violate[d] any duty it owed it Tai Landry[,]" it determined that "this violation of a duty by Pediatric Services of America, Inc. (PSA)" did not "cause any loss, injury or damage to Tai Landry." Rather, it attributed both a breach of the duty owed and one hundred percent of the causation of the damages sustained to Dr. Simakajornboon. Given the attribution of fault to Dr. Simakajornboon, a nonparty, the jury awarded no damages to the plaintiffs. Subsequently, the plaintiffs filed a motion for judgment notwithstanding the verdict, which was denied by the trial court.

Ms. Landry appeals, assigning the following as error:

I.  The jury committed manifest error in failing to find PSA's conduct caused hypoxic injury to Tai Landry
.

II. The trial court committed legal error by submission to the jury of a legally defective verdict form which produced jury confusion on the issue of causation, meriting *de novo* review.

III. The jury failed to follow the jury instruction on cause-in-fact and produced legal error meriting *de novo* review.

IV. The trial judge erred in denying the motion for judgment notwithstanding the verdict and in refusing to conduct a *de novo* review of the case.

4

V.   The jury committed manifest error and failed to follow the verdict form in awarding zero damages to all the claimants.

(Record citations included in Ms. Landry's brief omitted.)  Mr. Landry also appeals and alleges manifest error in the determination that PSA's conduct was not a cause of the damages sustained.  He also questions the failure to award damages.  Each plaintiff adopts the other's brief, assignments of error, and arguments.

**Discussion**

*Causation*

The plaintiffs question the jury's determination that PSA breached the standard of care but that it did not cause Tai's injuries.  They argue that the jury's full assignment of fault to Dr. Simakajornboon reflects the jury's rejection of PSA's theory that the hypoxic insult to Tai's brain occurred either in utero or shortly thereafter.  Instead, the plaintiffs contend that the jury determined that the brain damage occurred after the period of time when Dr. Simakajornboon had an opportunity to press for more invasive treatment in order to prevent the ultimate damage claimed.  The plaintiffs assert that, with PSA's theory eliminated, it was manifestly erroneous for the jury not to have viewed evidence of the escalating series of events occurring during Downloads 3 and 4 as at least a partial causative factor in Tai's ultimate injury.

We note that this assignment of error is specifically targeted toward the liability of PSA, which is not a qualified health care provider under the Medical Malpractice Act.  Under the relevant analysis as it pertains to PSA, the plaintiffs were required to prove that:  1) the defendant had a duty to conform his or her conduct to a specific standard of care; 2) the defendant failed to conform his or her conduct to that standard; 3) the substandard conduct was a cause-in-fact of the plaintiff's injuries; 4) the substandard conduct was a legal cause of the plaintiff's injuries; and that 5) the

5

defendant sustained actual damages. *Brewer v. J.B. Hunt Transp., Inc.*, 09-1408 (La. 3/16/10), 35 So.3d 230. A determination as to cause-in-fact is a question of fact, subject to the manifest error standard of review. *Id.*

We first address the plaintiffs' contention regarding the nature of the duty breached. The plaintiffs' argument on this point assumes that the jury determined that PSA failed to deliver, timely or otherwise, Downloads 3 and/or 4 to the physicians. However, as discussed above, the jury was only generally asked if PSA or its employees violated "any duty that it owed to Tai Landry." The verdict sheet did not ask the jury for the precise duty it found to have been breached. For discussion purposes only, and in relation to this assignment, we consider as true the plaintiffs' contention that the jury found that PSA failed to deliver data to the physicians.

As stated, the jury attributed one hundred percent of the fault for Tai's injuries to a breach of duty it found on the part of a nonparty physician whose involvement in the case stemmed from a September 12th-13th sleep study at Tulane. The resulting report was addressed to the referring geneticist and was completed September 16th. The report commemorated that the purpose of the study "was to evaluate if there is any evidence of significant apnea in the patient with a history of Pierre Robin[.]" It noted that Tai had "recurrent apneaic events." Ultimately, the report concluded that: "[T]his is an abnormal sleep with evidence of significant obstructive sleep apnea associated with significant oxygen desaturation and mild cardiac deceleration. In addition, evidence of nocturnal hypoxemia was also observed. No evidence of significant hypoventilation was noted." Dr. Simakajornboon recommended the use of supplemental oxygen and additional evaluation. He did not recommend immediate hospitalization and/or surgical intervention.

At trial, expert witnesses called the recommendations resulting from the sleep study into question. Dr. Gary Freed, an expert in pediatrics, neonatology, and apnea

6

monitoring, testified extensively regarding the use of monitors in recording apnea and heart rate events. One aspect of his deposition testimony, presented at trial by the plaintiffs, involved the risk inherent in Tai's condition. He opined that, given the risks posed, various points throughout Tai's first weeks required more drastic intervention. Dr. Freed identified the sleep study as one such point and concluded that it revealed breathing obstruction sufficient to warrant immediate admission for surgical intervention. Yet, the jury was aware that Tai was neither admitted nor was surgical intervention recommended. Dr. Freed was also critical of the recommendation for supplemental oxygen because it, alone, did not overcome any airway obstruction.

Similarly, Dr. Douglas Holmes, accepted as an expert in the field of otolaryngology, concluded that the supplemental oxygen had no way to enter the obstructed pathway and determined that, given that the sleep study results were "grossly abnormal[,]" Tai's physicians should have been immediately notified and further intervention urged. However, the jury heard testimony indicating that the sleep study results were not completed until September 16th and, at that time, were prepared only for the referring geneticist. Accordingly, and under the standard of review, we find that the record, including expert testimony, supports the jury's finding that the sleep study recommendations and/or reporting violated the standard of care.

In considering this testimony, it is apparent that, on the causation issue, the jury may have determined that the sleep study provided the point at which intervention could have prevented the damage ultimately sustained by Tai. In this regard, the jury may have reasonably concluded that immediate intervention following the sleep study, as suggested by Drs. Freed and Holmes, would have precluded the events occurring during the subsequent periods of Downloads 3 and 4, the point at which the plaintiffs contend injury occurred.

7

We further address the plaintiffs' contention that PSA must be found to be at least comparatively at fault. Above, we rejected the plaintiffs' assumption that the jury necessarily concluded that PSA's substandard conduct was the failure to relay information as the plaintiffs advanced various theories of negligence. However, even assuming that the jury found that PSA failed to deliver the information during the time period of Downloads 3 and 4, the jury may not have been persuaded that the damage could have been avoided given the limitations of the home monitoring system.

The events captured during Downloads 3 and 4 were characterized as serious, ominous, and escalating. However, the jury was aware that the monitor merely captured the events and alerted the parents so that the child could be roused. The monitor did not initiate treatment. Undoubtedly, the jury may have recognized that debilitating events may have occurred before any download and delivery of the data could be made. Additionally, such events could have occurred before the monitor filled to 80%, initiating the series of events that had to occur before any intervention was even possible. Also, the jury was aware that Tai's dangerous events neither started nor stopped with Downloads 3 and 4. Dr. Freed, for example, expressed his opinion that Tai was in "bad shape" even after Download 1, which preceded the period of the sleep study. Given this information, along with the speculative nature of the course of events the plaintiffs urge would have occurred upon delivery of Downloads 3 and 4, the jury may have felt that the plaintiffs simply failed to sustain the burden of causation with regard to PSA. We do not find that this is an unreasonable or unsupported view of events.

Finally, we point out that we consider this case under a manifest error standard of review. The scope and depth of testamentary and documentary evidence in this case is significant. The parties' collective presentation to the jury involved multiple theories of causation, commented upon by numerous expert witnesses. We do not

convey here the breadth of that information nor do we discuss and/or negate the various findings possible under that evidence. Instead, we observe that, for the above reasons, the approach taken by the jury is reasonable under the record as a whole. In such an instance, an appellate court does not find that the factfinder's determination was manifestly erroneous. *See Linnear v. CenterPoint Energy Entex/Reliant Energy*, 06-3030 (La. 9/5/07), 966 So.2d 36. Further, to the extent that the jury's determination was necessarily dependent on various credibility determinations involving conflicting expert testimony and interpretation of the physical evidence, we are mindful that those credibility determinations are left to the discretion of the jury. *Rosell v. ESCO*, 549 So.2d 840 (La.1989). Such conclusions "can virtually never be manifestly erroneous or clearly wrong." *Id.* at 845.

This assignment lacks merit.

*Verdict Form*

We next address the parties' contention that the jury verdict form submitted to the jury was legally defective, requiring a de novo review. The plaintiffs suggest that the jury's findings of causation reveal jury confusion and argue that the origin of this may rest in the jury verdict sheet. The parties note that, during the jury's four day deliberation, it asked a variety of questions. The plaintiffs suggest that these questions evidence the jury's confusion as to causation. They contend that, although the jury found no violation of applicable duties on their part, or the part of the defendant doctors, the jury felt compelled to answer the verdict form's causation questions. The plaintiffs assert that this confusion requires a de novo review.

As explained above, we find that a discernable path exists for the jury's conclusions regarding causation. Although we find that the record supports the verdict upon a review of all of the evidence, we consider in this assignment whether the jury's verdict may have been attributable to confusion surrounding the

9

interrogatories posed. We are mindful in our review that, while misleading or confusing interrogatories may constitute reversible error, the manifest error standard of review is applicable unless the interrogatories are "so inadequate or incorrect as to preclude the jury from reaching a verdict based on the law and the facts." *Ardoin v. McKay*, 06-171, p. 7 (La.App. 3 Cir. 9/27/06), 939 So.2d 698, 703, *writ denied*, 06-2606 (La. 1/8/07), 948 So.2d 126.

The verdict form here inquired of the breach of the duty/standard of care of each of the defendants as well as the nonparty physicians in this case. The verdict form then instructed the jury that, if it found no such breach, they were not to engage in "further deliberations" as to that actor nor assign fault to that actor. As the plaintiffs observe, despite their findings of no breach of duty on the part of all actors other than PSA and Dr. Simakajornboon, the jury answered the causation questions regarding all of the actors. Upon review of the verdict sheet, we do not find that the questions posed are either inadequate or incorrect. Neither do we conclude that the jury's completion of all of the questions indicates confusion regarding causation. Rather, it appears that the jury simply spoke to all of the questions. The fact that the jury found that PSA did not cause the damage to Tai and, additionally, assigned zero percent of fault to that party seemingly corroborates its finding of no causation.

Finally, the jury did, in fact, make a number of inquiries of the trial court during its deliberation. The questions, filed into the record, however, do not reveal confusion leading to an incorrect verdict. They instead reveal that the jury was deliberating on the complex and varied questions it was asked to resolve.[4] The questions arose in a

---

[4] The record includes the handwritten jury requests from the jury, many of which include requests for exhibits:

"We need Nalam's records & hospital records"

"Can we have dry erase markers"

10

case involving multiple parties, seven nonparty physicians appearing on the verdict sheet, and multiple theories of causation. In this context, we do not find that its questions indicate either confusion or error. Strikingly, the questions reveal the jury's

---

"Can we see Tai's video's from the hospital?"

"The video Lambert showed first? We want the video where Camille was holding & feeding tube in mouth?"

"Can we have 12 copies of the jury verdict form?"

"Can we view the entire sleep study?"

"If we don't find anyone cause loss, injury, or damage, can we still award for physical pain and suffering?"

"Life plans of Bauer (both high & low) and Hegward"

"If we cannot agree on PSA can we make a decision on the doctors?"

"Can we see PSA's policy – procedure?"

"PSA Policies [requested policy sections omitted]"

"How many have to agree for the even numbers [(causation questions)] for the answer to be yes"

"Can we view Mr. Hammon's exhibit chart and the downloads?" Upon inquiry from the trial court, the jury requested: "Mr. Hammons download chart & all of the episodes from downloads 1-5. With the stick on boards. Downloads 3-4 are in red."

"Can we have a calendar?" When asked for further detail, the jury explained: "Can we see Mr. Judice's calendar with all of the doctor's names and appointments?"

"In regards to question #11[breach of the standard of care of the nonparty physicians] . . . do you need 9 of 12 or does 1 allow you to assign fault?" To this inquiry, the trial court responded: "You need 9 of 12."

"We request to see Downloads 1-5. Entire download."

"At this moment, we do not feel that we will be able to come to a conclusion tonight. May we be excused and pick-up tomorrow morning?"

"We do not think we to [sic] a majority decision. How much longer do we have to deliberate?"

"Can we get the exhibit list?"

"We need the following [(exhibit numbers omitted)]; Do you want us to send back the exhibits we are through with?"

"Can we also view PSA-19 Petition for Damages . . ., PSA 6B, PSA 14&14A." The jury later corrected its request for PSA-91 rather than PSA 19.

"Can we have [sic] please have the downloads back?"

11

consideration of the plaintiffs' allegations against PSA. The jury's ultimate determination to find no merit in those allegations does not equate to confusion.

This assignment lacks merit.

*Jury Instruction – Cause-In-Fact*

The plaintiffs additionally argue that a de novo review is warranted in light of what they contend was the jury's failure to follow the trial court's instruction on cause-in-fact. They point to that portion of the trial court's instructions explaining that:

> As to the requirement that plaintiffs' injuries be caused by defendant's conduct, **I do not mean that the law recognizes only one cause of any injury, consisting of only one factor or thing, or the conduct of only one person. On the contrary, many factors or things may operate at the same time, either independently or together, to cause injury or damage.** You should resolve this question by deciding whether plaintiffs would probably have suffered the claimed injuries regardless of what the defendants did. If the plaintiffs probably would have suffered those injuries regardless of what the defendants did, then you must conclude that the injuries were not caused by the defendants, and render a verdict for the defendants. If, on the other hand, plaintiffs probably would *not* have suffered the claimed injuries in the absence of defendants conduct, then you must conclude that defendants conduct did play a part in plaintiff's injury and you must proceed to the next element.

(Emphasis added in Ms. Landry's brief.)(Full text of the instruction provided.) The plaintiffs contend that the jury's completion of those aspects of the verdict form regarding causation for the parties/nonparty physicians it found not to have breached the standard of care, leads to an inference that the jury "believed that only one party could be found at fault on the verdict [sheet.]"

Our review reveals no such inference. As explained, the jury's finding of causation was reasonable upon review of the record. And, in addition to the cause-in-fact instruction, the trial court informed the jury of comparative negligence subsequently in its instruction. The trial court spoke extensively regarding the burden

12

associated with a finding of comparative fault on the part of the plaintiffs and then explained:

> If you conclude that the defendants and the plaintiffs and/or other third parties were negligent, and that the negligence of each was a cause in fact of plaintiffs' injuries, then you must assign percentages of fault to each one. In determining those percentages, you may consider the nature of the negligent conduct and the extent of the causal relation between the conduct and plaintiffs' injuries.

> . . . .

> The law requires that should you find fault then you divide the total responsibility for this incident among all those upon whom you found fault, whether parties or non-parties. You should do this by assigning percentages of fault to the various involved persons which will total 100%. You are free to assign whatever percentage you feel appropriate, and you should do so by answering the questions, which will be provided to you on a special verdict form.[5]

It cannot be said that the trial court's instructions failed to inform the jury of the law regarding causation and/or apportionment of fault among multiple actors. Additionally, the jury verdict sheet prompted the jury to apportion fault as follows:

> Please state the percentages of fault attributable to Pediatric Services of America, Inc., Cong T. Vo, M.D., Rosaire Belizaire, M.D., Vasanth Nalam, M.D., Camille and Ryan Landry, and the name of and the percentage of fault attributable to the [nonparty] physicians identified in Interrogatory No. 11 (if any). (Note that the total of your percentages must be 100%).

There is no indication that the jury was confused by any of these instructions, was incorrectly instructed, or failed to follow any of those instructions. Rather, the jury determined that the plaintiffs sustained their burden of proof as to only one actor's fault.

This assignment lacks merit.

---

[5] In addition to its verbal instructions to the jury, the trial court provided a copy of the instructions, in written form. The written instructions were entered into the record. For quotation purposes, we draw from the written instructions.

13

*Damages*

The plaintiffs next cite error in the jury's decision not to award damages in this case and again find indication of the jury's confusion in its decision to award zero damages. Ms. Landry notes that the jury responded "yes" to the inquiry as to whether any of the nonparty physicians' failure to comply with the applicable standard of care "was a cause of the alleged damages suffered by the plaintiffs." Given this response, she contends that "it is clear that the jury's responses of either "no" or "zero" to the damage questions are internally inconsistent and more likely were the product of confusion caused by the verdict form." She again contends that this confusion requires a de novo review.

Obviously, the human factors involved in this case are compelling. The fact that damages are associated with an infant sustaining profound and permanent brain damage, of whatever origin, is unquestioned. However, the only fault found in this case involved a *nonparty*, a finding we have found supported by the record. Therefore, the jury's findings as to damages would be superfluous. Accordingly, we do not disturb the jury's award.

*JNOV*

Finally, and for the issues of causation cited above, the plaintiffs contest the trial court's denial of a judgment notwithstanding the verdict, a mechanism provided for by La.Code Civ.P. art. 1811.

In consideration of a motion for JNOV, the trial court determines whether the facts and inferences point so strongly and overwhelmingly in favor of one party that reasonable persons could not arrive at a contrary verdict. *Joseph v. Broussard Rice Mill, Inc.*, 00-628 (La.10/30/00), 772 So.2d 94. The trial court is required to deny the request for JNOV if evidence opposing the motion "is of such quality and weight that reasonable and fair-minded persons in the exercise of impartial judgment might reach

14

different conclusions." *Id*. at 99. It may not evaluate the credibility of witnesses. *Id.* Further, it must resolve all reasonable inferences or factual questions in favor of the non-moving party. *Id*. On review, an appellate court uses the same criteria as did the trial court and first considers whether the trial court erred in its disposition of the motion for JNOV. *Id*. Thus, the appellate court considers whether "the facts and inferences point so strongly and overwhelmingly in favor of the moving party that reasonable persons could not arrive at a contrary verdict[.]" *Id.*

In ruling, the trial court recognized the above standard and remarked upon the difficulty of its decision, stating that: "It almost seems as though the Jury didn't sit through the same trial that we sat through." However, it acknowledged that "considerable deference should be given to the Jury's findings. All reasonable inferences are resolved in favor of a nonmoving part." The trial court concluded:

> If I could make credibility determinations, then the plaintiffs' argument would be compelling and my ruling would probably be different.
>
> I don't agree with Ms. Fois that all the Jury's questions were reasonable. I thought some of them were very unreasonable, particularly coming back again and again and saying, "How many do we need for this? How many do we need for this?" But I cannot say that the Jury did not find that the brain damage was not caused from a combination of prenatal factors and possible hypoxia or bradycardia.
>
> PSA was made out to be negligent in several aspects. The jury found them to be negligent, but decided that there was no causation between their negligence and the damage to Tai Landry. And I can't say why they found them to be negligent. It could be because they didn't properly train Ms. Wood or even some other reason. I simply can't make those calls in a JNOV.
>
> I can't say that Downloads 3 and 4 were not delivered to Drs. Vo and Belizaire. There was testimony by a former employee that they lost downloads and things like that before, contrary to their testimony.
>
> Dr. Simakajornboon, they found, breached the standard of care. But they could have found that although he breached the standard of care, that did not cause the damage. They could have found that the damage was caused by some prenatal defect or a combination of that and hypoxia.

15

It's a tough determination. It's not - - well, the law doesn't give me a lot of a leeway, not as much as I wish I had in this case.

Even despite the loss of evidence by PSA, I still don't think that I can legally under the law grant the plaintiffs' judgment notwithstanding the verdict. The motion is denied.

Having reviewed the record in light of the standard of review, we leave the trial court's denial of the motion for JNOV undisturbed. As acknowledged by the trial court, the plaintiffs presented evidence in support of their case which could have arguably supported a different result given different findings of fact and credibility. However, having found the jury's conclusions reasonable, we do not re-evaluate its credibility or factual findings on review of the ruling on the JNOV. In short, the jury's conclusion that the plaintiffs failed to present evidence of causation as to the named parties is reasonable.

This assignment of error lacks merit.

### DECREE

For the foregoing reasons, the judgment of the trial court on the merits of this matter is affirmed. Additionally, the trial court's judgment denying the motions for judgment notwithstanding the verdict is affirmed as well. All costs of this proceeding are assessed to the appellants, Camille Landry and Ryan Landry.

**AFFIRMED.**

16

STATE OF LOUISIANA

COURT OF APPEAL, THIRD CIRCUIT

12-277

CAMILLE LANDRY, ET AL.

VERSUS

PSA OF LAFAYETTE, LLC, ET AL.

**SAUNDERS, J., dissents and assigns written reasons.**

At the oral argument of this case, Plaintiff argued strenuously that the record contained no evidence of the standard of care required of Dr. Simakajornboon. Defendant suggested that there was evidence to this effect. This moved the court to request that the parties file post-hearing briefs on testimony as to Dr. Simakajornboon's standard of care and how his alleged failure to comply with the standard of care may have caused the damage suffered by Tai Landry. These briefs document clearly that there is no testimony as to the applicable standard of care or a causal relationship between Dr. Simakajornboon's care and the brain damage. My review of the record verifies the absence of any such evidence. The majority opinion, by its silence on the issue, seemingly concedes that no standard of care was established. As such, there is no evidence to justify a finding of fault on the part of Dr. Simakajornboon or to justify a finding that his actions caused the injuries sustained by Tai Landry. These finding were used to apportion zero percent fault to defendant, PSA. This is fundamental legal error.

Ordinarily, trial court findings of fact are reviewed on appeal under manifest error standard. However, as stated in *Evans v. Lungrin*, 97-0541 (La. 2/6/98), 708 So. 2d 731, 735:

[W]here one or more trial court legal errors interdict the fact-finding process, the manifest error standard is no longer applicable, and, if the record is other complete, the appellate court should make its own independent de novo review of the record to determine a preponderance of the evidence. A legal error occurs when a trial court applies incorrect principles of law and such errors are prejudicial. Legal errors are prejudicial when they materially affect the outcome and deprive a party of substantial rights. When such a prejudicial error of law skews the trial court's finding of a material fact and causes it to pretermit other issues, the appellate court is required, if it can, to render judgment on the record by applying the correct law and determining the essential material facts de novo. [Citations omitted.]

Where the trial court commits legal error by applying an incorrect legal standard, an appellate court is required to determine the facts de novo from the entire record and render a decision on the merits. *Bell v. Ayio*, App. 1 Cir.1998, 731 So.2d 893, 1997-0534 (La.App. 1 Cir. 11/13/98).

To determine medical malpractice on the part of a physician, the negligence of the physician must be proved by a preponderance of the evidence. This evidentiary standard cannot be lowered just because the physician is not there to defend himself. The jury must be instructed that the injury alone does not raise a presumption of the physician's negligence. La.R.S. 9:2794(C). Additionally, there must be proof as to the standard of care exercised by physicians licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances. When a physician practices in a particular specialty and where the alleged acts of medical negligence raise issues of the particular medical specialty involved, the standard of care must be that ordinarily practiced by physicians involved with the medical specialty. La.R.S. 9:2794(A)(1). Once a standard of care has been established, then, for a finding of negligence, it must be proven that the standard of care was breached and this breach resulted in the injuries sustained. La.R.S. 9:2794(A)(2-3).

To support a finding of fault on the part of Dr. Simakajornboon, evidence is required to prove the standard of care for a specialist in his field, breach of this

2

standard, and causation as to the injury sustained. The record is devoid of this testimony or evidence. No standard of care as to sleep specialists was established. In the absence of evidence as to the appropriate standard of care, Dr. Simakajornboon cannot be cast in judgment or held to be negligent. Again, this very lengthy record before us is devoid of any evidence of the proper standard of care to be used by Dr. Simakajornboon. Again, neither the briefs of defendant nor the majority opinion dispute this fundamental absence of evidence.

I cannot overemphasize the impropriety of finding fault on the part of a physician who is a non-party and as to whom no standard of care has been established. This is high-stakes litigation. There were originally four defendants. The defense spent over two hundred thousand dollars in expert fees. That Dr. Simakajornboon was not made a party suggests strongly that there was no case against him, arguably, because he did not breach the standard of care required of his specialty and no physician could be found, by any party, to testify to the contrary.

It should also not go without notice that Dr. Simakajornboon stands to suffer great personal and professional harm by the rendition of an opinion finding him to have caused damage to this child. While this sort of professional assault may be an unfortunate but necessary consequence of litigation, we should not be insensitive to this by-product of our work and should be diligent in requiring litigants who present a claim against an absent non-defendant to meet the minimum burden of proof required by law. Here, this burden has not been met, and in my view it is a great travesty of justice to fail to correct the error.

My review of the record also suggests that PSA was clearly at fault and the jury committed manifest error in finding otherwise. The record reflects that beginning in Download 3, which itself was after Dr. Simakajornboon's sleep study, Tai's

3

condition worsened. It is legally unsupportable for the jury to have concluded that PSA, while breaching its standard of care for not relaying information that Dr. Simakajornboon did not otherwise have access to or could not have known, did not cause the damage to Tai. It is clear from the record that PSA and Kim Wood were negligent in not reacting to the results of Download 3, where a dramatic increase in hypoxic events occurred. Ms. Wood testified this should have immediately prompted her into action. The "red flag" of Download 3 filling to capacity in six hours would have prompted immediate medical intervention had it been communicated to Tai's doctors. Instead, the information never reached her treating physicians. It is uncontroverted that, had information PSA controlled been delivered in accordance with PSA's contractual responsibilities, Tai's doctors would have drastically altered their recommendations for medical management of her airway. Fault is thus clear and manifest.

The damages are massive. I find all damages should be awarded. I respectfully dissent.